239 So.2d 817 (1970)
The CITY OF ST. PETERSBURG, George McGonegal and Betty McGonegal, His Wife, Appellants,
v.
BRILEY, WILD & ASSOCIATES, INC., Pinellas County, Florida, a Political Subdivision of the State of Florida, Harold Mullendore, Clerk of the Circuit Court of Pinellas County, Florida, City of Safety Harbor, Florida, a Municipal Corporation; City of Belleair Beach, Florida, a Municipal Corporation, Appellees.
No. 39240.
Supreme Court of Florida.
September 23, 1970.
Rehearing Denied October 26, 1970.
*818 Carl R. Linn, St. Petersburg, for appellants.
Richard Stewart, Clearwater and Frank L. Watson of Bryant, Freeman, Richardson & Watson, Jacksonville, for appellees.
MASON, Circuit Judge.
This is an appeal from a decision of the Circuit Court of Pinellas County initially construing Article VIII, Section 1(h) of the 1968 Constitution of Florida, F.S.A., which is as follows:
"(h) Taxes; Limitation. Property situate within municipalities shall not be subject to taxation for services rendered by the County exclusively for the benefit of the property or residents in unincorporated areas."
We have jurisdiction under the provisions of Article V, Section 4(2).
This suit is one brought by the plaintiff, Briley, Wild & Associates, Inc., consulting engineers, against the defendant, Pinellas County, Florida, to recover payment of the sum of $100,381.73 allegedly due the plaintiff from the defendant for engineering services rendered under a contract between the parties by the terms of which the County employed the plaintiff as consulting engineers in connection with a proposed construction and expansion of sanitary sewage facilities in Pinellas County. The contract between the plaintiff and defendant County provided that the plaintiff would furnish all sanitary engineering work for the County in connection with said project. The over-all plan called for the ultimate cost to the County of approximately $50,000,000.00 to be divided into several phases. The beginning phase is calculated to cost $2,500,000.00, and it is for services rendered by plaintiff in connection with this phase of the project that this suit was instituted. This particular phase of the work contemplates the construction of a master sewage treatment plant in an unincorporated area of the county, together with the construction of transmission lines and lift stations, in accordance with the plans and specifications prepared by the plaintiff.
The defendant County included in its 1969-70 budget as an item in the General Fund Capital Outlay Reserve Account the sum of $2,500,000.00 estimated to defray the costs of this phase one construction. This sum is now in the General Fund of the County and was raised from ad valorem taxes levied upon all properties situated in the county, both in the incorporated and in the unincorporated areas. When the plaintiff presented its bill for payment for services to date the same was questioned by the Clerk of the Circuit Court, acting as County Auditor, it being his contention that the provisions of Article VIII, Section 1 (h), supra, prohibit the use of monies raised by general ad valorem taxation to defray the costs of sewage facilities to be constructed in unincorporated areas of the county. The defendant County wants to pay the plaintiff, and, therefore, this lawsuit was begun as a friendly suit to determine its authority to do so. By way of counterclaim the defendant County sought a declaratory judgment of the trial court to construe the effect of the above constitutional provision upon its authority to pay not only the plaintiff for its services rendered *819 to date, but also to use general county ad valorem taxes to defray this particular phase of the contemplated project and future phases thereof. The City of St. Petersburg, the Clerk of the Circuit Court of Pinellas County, the City of Safety Harbor, the City of Belleair Beach and the McGonegals, as taxpayers, intervened to contest the authority of the County to spend funds derived from general ad valorem taxes for the purposes heretofore stated. Thus, a suit which started out as a friendly lawsuit concluded as a bitterly contested one, primarily between the County of Pinellas and the City of St. Petersburg and the McGonegals, as residents and taxpayers of the City of Safety Harbor.
The suit went to trial upon the complaint of the plaintiff, the answer and counterclaim of the defendant County and the pleadings of the intervenors. The trial judge held that the contract sued upon was a valid and binding contract between the County and the plaintiff, that the amount sued for was properly due and owing from the County to the plaintiff under the contract, that the County was entitled to a declaratory judgment as to its authority to pay such sum to the plaintiff, that the Board of County Commissioners of the County proceeded properly under Special Act 69-1479 in approving and initiating the implementation of the master sewage facilities plan of the County, in accordance with the plan prepared by the plaintiff, for the purpose of eliminating pollution for the benefit of all areas of the County, both incorporated and unincorporated.
The record upon which the trial judge based his findings establishes that the population of the County is increasing rapidly in many of the unincorporated areas which are urban in nature and already densely populated; that the City of St. Petersburg located in the southeast portion of the county composes about one-fourth of the county area and has approximately 222,885 people and 58 square miles; that the city millage rate in that city is 16.25 mills; that the county millage rate is 10 mills county-wide; that St. Petersburg, through its own resources plus a federal grant, has built and operated its own sewer treatment facility and renders quality sewerage services to its residents estimated to be adequate for its own area until 1985; that the urbanized areas of the County with few exceptions have shown no desire to incorporate; that over a period of years the County has attempted to solve the sewage pollution problem of the county as a whole by acquisition and construction of sewer systems through the use of special sewer districts created pursuant to the provisions of Chapter 153, Part II, F.S., financing such systems by revenue certificates issued against prospective service fees charged to the people served and/or assessed against their property; that the County purchased the sewer system serving the municipality of Kenneth City with the proceeds of such revenue certificates, and has purchased several other small existing systems by using available general funds of the County; that there exists an admitted present need in the County for upgrading its sewer plants and for providing additional sewage treatment facilities for the districts and for the other fastgrowing urban areas of the County; two of the existing municipal systems have inadequate treatment facilities and are now being operated beneath State Health standards and have been cited by State Health authorities for failure to bring their plants up to proper standards. Because of these problems the County sought and obtained a special act of the Legislature in 1969 (Chapter 69-1479) which would authorize it to consolidate the various sewer districts as a first step to embark on a county-wide sewerage system plan pursuant to the general act, Chapter 153, F.S., and in accordance with a master plan prepared by consulting engineers; that this master plan called for as the first phase of the over-all plan of sewerage control the construction of a master sewage treatment plant to be located in the southwestern portion of the County which would permit and call for the elimination of several smaller *820 plants in some of themunicipalities and unincorporated areas of the county; such master treatment plant is to be constructed adjacent to the existing treatment plant of the South Cross Bayou Sanitary District located in an unincorporated area of the county; that the existing plant now treats sewage from the City of Kenneth City and from parts of the cities of Pinellas Park and Largo; that it is proposed that such new master treatment plant (including the existing South Cross plant) will treat the sewage of the incorporated areas of Madiera Beach, Redington Beach, North Redington Beach and Redington Shores immediately upon its completion, and contracts have been entered into with those cities by the County for such purpose.
The Board of County Commissioners of the County in implementing the special act of the Legislature (Chapter 69-1479, Special Laws of Florida) adopted the master plan as prepared by the plaintiff consulting engineers and by resolution determined that there was a need for master pollution control facilities of sanitary sewerage in the County; that inadequate sewage treatment is presently polluting the rivers, streams, and bays throughout the County; that the implementation of the master sewerage facilities plan prepared by the plaintiff will tend to eliminate such pollution, and that the results will be beneficial to all residents of the County, including those in the incorporated as well as in the unincorporated areas.
The Court below specifically found
(1) That the purpose of the proposed project was the elimination or control of county-wide sewage disposal and that its attendant effect upon county-wide pollution in various forms would be of beneficial use to and in the best interest of the present and future welfare and well-being of the unincorporated areas as well as the incorporated areas of Pinellas County, Florida,
(2) That Special Act 69-1479 supplements the provisions of Chapter 153 Florida Statutes, and that the latter does not set forth the exclusive means by which the subject matter of this suit may be financed,
(3) That the use of the General Fund of Pinellas County to pay the sums due called for under the contract between the plaintiff and the County does not violate the provisions of Article VIII, Section 1(h), of the Constitution of the State of Florida of 1968, and that
(4) The use of the General Fund of Pinellas County to advertise for bids and pay for the construction of the facilities called for in said plans and specifications prepared by the plaintiff would not be in violation of Article VIII, Section 1(h).
The trial Court entered judgment against the County and in favor of the plaintiff in the sum sued for and adjudged that the County may proceed to construct and legally pay for from the General Fund of the County the facilities called for in such plans and specifications.
Two questions are raised by the appellants. First, whether all necessary parties were before the Court below to enable it to enter a proper declaratory judgment and, second, whether the facts before the chancellor justified him in concluding that the services proposed to be rendered by the County by the use of county-wide levied taxes would not be "exclusively for the benefit of property and residents in the unincorporated areas," but would benefit the residents and property of all areas of the County, both incorporated and unincorporated.
As to the first question, we find that all parties necessary for the trial court to enter its declaratory judgment were before the Court. Such parties were the plaintiff, who was suing to recover for its engineering services, the County, who was sued for such services, and the Clerk of the Circuit Court, who, acting as County Auditor, had refused to pay the bill and who intervened for the purpose of raising the question of the authority of the County to use monies raised from county-wide *821 levied taxes for the project contemplated by the over-all plan prepared by the plaintiff engineering company, under its contract with the County. Since the primary question in dispute was the authority of the County to use county-wide levied taxes for the proposed sewer expansion the only necessary parties for the Court to enter a judgment upon the question was the plaintiff who rendered the services, the County who received the benefit of the services and the County Clerk who refused to sign a check for payment until the authority to do so was determined by judicial decision. These three parties presented to the trial court a justiciable controversy under the provisions of the declaratory decree statutes of the State of Florida of such character as to empower such court to determine whether or not county-wide levied taxes may be used to defray the costs of the proposed sewer expansion, and which such costs include plaintiff's bill for services rendered. Ch. 87 F.S.; Tulip Realty Co. of Florida v. Fuhrer, Fla.App., 155 So.2d 637; Banyan Cafeterias, Inc. v. Faith Lutheran Church (1963, Fla.) 151 So.2d 426.
The critical question in this case is whether the expenditure of county-wide levied tax monies is authorized for the proposed project. Article VIII, Section 1(h), proscribes the use of tax monies received from taxes levied upon property situate within municipalities "for services rendered by the County, exclusively for the benefit of the property or residents in unincorporated areas." The record discloses that Pinellas County is composed of unincorporated areas, plus approximately twenty-three cities and towns. It is conceded by the appellees that the fund from which it is proposed to pay the plaintiff's bill and to construct the proposed sewer expansion was created by the receipts from ad valorem taxes levied by the County upon property situate within the municipalities of the County, as well as upon property lying within the unincorporated areas of the County. Therefore, if the services proposed to be rendered by the County and to be paid from such fund are services "exclusively for the benefit of property and residents in the unincorporated areas" the County may not use such county-wide levied tax monies for such purpose. We are called upon to decide first what is proscribed by the language "exclusively for the benefit of property and residents in the unincorporated areas" as used in Article VIII, Section 1(h) of the 1968 Florida Constitution, and second, whether or not the record herein supports the findings of the trial judge that the proposed project is not for such proscribed services, but will benefit the property and residents of the municipalities as well as those of the unincorporated areas.
This is a case of first impression in Florida since the constitutional provision construed by the trial court is new in the 1968 Constitution, neither it nor a similar one being incorporated in the Constitution of 1885. In reviewing his construction of the provision we are called upon to decide what is meant by the language which says that "property situate within municipalities shall not be subject to taxation for services rendered by the County "exclusively for the benefit of the property or residents in unincorporated areas." (Emphasis supplied). The key phrase to be interpreted is the phrase "exclusively for the benefit of the property or residents in unincorporated areas," for the proscription here is against the taxation of municipally-situated property to pay for services rendered exclusively for the benefit of the unincorporated areas of the County. It is evident from this language of proscription that the cost of services rendered by the County which are not rendered "exclusively for the benefit of the property or residents in unincorporated areas", but which benefit property situate in incorporated areas may be taxed against municipally-situate property as well as that outside of cities. We must determine what is meant by the term "exclusively for the benefit of" as here used by the framers of this provision, and *822 as understood by the people at the time they adopted it in the General Election of 1968. We are obligated to give effect to this language according to its meaning and what the people must have understood it to mean when they approved it. Advisory Opinion to the Governor, 156 Fla. 48, 22 So.2d 398 (1945); In Re Advisory Opinion to the Governor, Fla., 223 So.2d 35 (1969). If the language is clear and not entirely unreasonable or illogical in its operation we have no power to go outside the bounds of the constitutional provision in search of excuses to give a different meaning to words used therein. Vocelle v. Knight Bros. Paper Co., Fla.App., 118 So.2d 664; Cassady v. Consolidated Naval Stores Co., Fla., 119 So.2d 35. The term "exclusive", which is the adjective from which the adverb "exclusively" is derived, is defined in Webster's New International Dictionary as "single", "sole"; "as an exclusive agent"; also "singly devoted", "undivided"; "limiting or limited to possession, control, or use by a single individual, organization, etc.," "as the exclusive privileges of the citizens of a country." If we give the phrase this literal interpretation it would be to hold that if the service proposed to be rendered by the County would be of the slightest benefit to property located in a particular municipality, however minute in quantity or quality, such service could not be said to be "exclusively for the benefit" of the unincorporated areas of the County, and it would, therefore, subject such municipal property to county taxation for such service. But, there is another and cardinal rule of statutory construction applicable to the construction of constitutional provisions and that is that the fundamental object is to ascertain and give effect to the intent of the framers and adopters thereof, and constitutional provisions must be interpreted in such a manner as to fulfill this intention, rather than to defeat it. 6 Fla.Jur. 281. Furthermore, constitutional interpretation is actuated by the rule of reason, and unreasonable or absurd consequences should, if possible, be avoided. Florida Dry Cleaning & Laundry Board v. Everglades Laundry, 137 Fla. 290, 188 So. 380. A literal interpretation should not be accorded if it leads to an unreasonable conclusion or to a result not intended by the lawmakers. Lanier v. Tyson, Fla. App. (1962), 147 So.2d 365.
To prevent an interpretation of this language which would lead to an unreasonable conclusion, or to one such as was not intended by the framers, we are privileged to look to the historical background of this particular provision. In Re Advisory Opinion to the Governor, Fla., 223 So.2d 35 (1969). When this particular proposal was before the Revisory Commission which framed the 1968 Constitution, there was considerable debate as to its meaning and purpose, as reflected by the minutes of such Revisory Commission. Also, when this proposal was considered by the Committee of the Whole of the House of Representatives, further debate reflected the purpose and intent of the proposal. An examination of the minutes of both bodies leads us to conclude that the purpose of the Revisory Commission in drafting this provision, and the House of Representatives in accepting it as so drafted, is to prevent double taxation of municipally-situated property for a single benefit. That the framers of the provision, and the people in adopting it, intended to prevent future taxation by counties of city-located property for services from which the owners of said property received no real or substantial benefit. To interpret the language used in this provision to mean that the County could tax city-located property for minute benefits rendered to such property would do violence to the intent and purpose of the framers and of the people in adopting the 1968 Constitution. It is evident from such historical background that the evil sought to be remedied was the taxation of municipally-located property for services rendered by the County which result in no real or substantial benefit to such property. We, therefore, hold that Article VIII, Section 1(h) of the 1968 Constitution of Florida prohibits the taxation of municipally-situate *823 property by the County for any services rendered by the County where no real or substantial benefit accrues to city property from such services. Conversely, this provision permits such taxation where such service is found to be of real and substantial benefit to such property.
We have examined the record to determine whether the proposed project will render any real or substantial benefits to property situate within the various municipalities of Pinellas County. It is conceded that the sewage from the City of St. Petersburg will not be treated in the proposed expanded treatment plant. It is not proposed that the county sewer system physically enter into any municipality of the county, and under the express provision of Chapter 69-1479, Special Acts of 1969, it is not permissible for the county system to enter into an incorporated city without the express permission of the latter. The record does disclose that the existing county system treats sewage from the City of Kenneth City and from parts of the Cities of Pinellas Park and Largo. It is proposed that the master treatment plant will treat the sewage of the incorporated areas of Madiera Beach, Redington Beach, North Redington Beach and Redington Shores, under contracts with those municipalities. But, the larger municipalities of the county will not actually use these facilities. This is particularly true of St. Petersburg and Clearwater.
But, there is undisputed testimony in the record to the effect that now substandard treated sewage is being discharged at points close to the City of St. Petersburg, the Madiera Beach outfall area and the outfall of the lower county system. Also, the County Sanitary Engineer testified that there is a serious possibility of disease spilling over and spreading from the county areas to the city areas, particularly into St. Petersburg, if the present situation is not remedied. The witnesses appearing before the trial judge testified that indirect benefit would result to all of the property and residents of the entire county by the elimination of pollution from the waters surrounding the county. There is testimony in the record to the effect that at present there are some one hundred forty-eight sewage outlets discharging effluent into the streams, waters and soils of the county, and that such discharge creates a county-wide pollution problem. The record reflects that the purpose of the proposed construction and expansion is to remedy this situation by reducing the number of septic tanks now discharging waste and improving the treatment of raw sewage now emptying into the soils, streams and waters of the county, with the ultimate goal of reducing pollution to acceptable standards promulgated by the State of Florida.
The trial court held that the proposed project had as its purpose the remedying of the situation outlined above and that it would result in such benefits to properties located in the municipalities of Pinellas County so as to authorize county taxation of such property for this particular service proposed to be rendered by the County. We agree. It is true that the benefits may not be direct in the sense that the owners of city-located property will physically use the expanded treatment plant, lines and lift stations. But we reject the argument of appellants that in order to avoid the proscription of Article VIII, Section 1(h) it is necessary that any benefit to municipalities be direct and primary. We hold that the proper interpretation of the language of this section of the Constitution does not require a direct and primary use benefit from a particular service to city-located property in order to remove the same from the proscription of the constitutional provision. It is sufficient to authorize county taxation of such property if the benefits accruing to the municipal areas are found to be real and substantial and not merely illusory, ephemeral and inconsequential. That it was not the intent of the framers of this provision of the Constitution to require a direct benefit to city-located property in order to avoid the proscription is evidenced by the fact that attempts *824 to amend the provision to substitute the words "directly" and "primarily" for the word "exclusively" were defeated before the proposition was submitted to the people for approval.
Water pollution and the attendant diseases and ills to human habitation that flow therefrom know no city or county lines. The evidence before the trial court indicates that the contamination of the waters of Pinellas County which occurs in the unincorporated areas contaminates waters located in the incorporated areas through the natural process of flow. Disease originating in the unincorporated areas resulting from improperly-treated sewage can and will readily spread throughout the county. Protection against such contamination and disease is not merely an incidental or collateral benefit which would result to the incorporated areas of the county by the correction of the problem in the unincorporated areas. This Court takes judicial knowledge of the fact that Pinellas County, with its numerous bays and streams, some of which are within the County and others contiguous thereto, is one of the finest recreation areas devoted to boating, fishing and swimming, in the entire southeastern portion of the nation. The population of this area has increased by leaps and bounds during the last decade as evidenced by the unofficial 1970 Census recently published by the U.S. Census Bureau. The population of Pinellas County during this decade increased from 374,000 plus to 515,000 plus, or a percentage increase of approximately thirty-six per cent. And the record indicates that this increase in population has brought with it attendant increase in pollution and contamination of the waters, soils and streams of the County, and that the present sewage disposal systems are not adequate to cope with the same. We are now living in a time when our citizenry is pollution conscious. As Judge John Rawls of the District Court of Appeal, First District of Florida, recently remarked in St. Regis Paper Company v. State of Florida, by and through Fla. Air and Water Pollution Control Commission, 237 So.2d 797, opinion filed July 14, 1970, "ecology is the `In' subject of today's citizenry, as it well should be." Some of the beaches of Florida have become almost uninhabitable with a great deal of the condition caused by inadequate sewage treatment and disposal. Again quoting Judge Rawls, "Man of all animals pollutes his habitat the greatest."
It is impossible to separate as between the various areas of the county the deleterious effect upon the public health of contamination and pollution occurring in a particular area. It is unrealistic to say that the elimination of pollution and contamination of the soils, waters and streams of the unincorporated areas of Pinellas County will not be of substantial benefit, healthwise and recreation-wise, to the incorporated areas.
We can conceive of services sought to be rendered by a county within a particular unincorporated area which would have no consequential benefits to the municipalities of the county such as, for instance, a library set up in an unincorporated area for the use and benefit of the area residents or, perhaps, a park or recreation facility for the residents of such area. Even the establishment of fire fighting facilities in a particular unincorporated area may not reasonably be said to be of consequential benefit to the incorporated areas. But, in the field of public health a different situation may readily exist. We believe that the record before the trial judge amply substantiates his conclusion that the proposed project would be of beneficial use to and in the best interest of the present and future welfare and well-being of the residents of all areas of Pinellas County, and that, therefore, the proscription of Article VIII, Section 1(h) is not applicable to the particular project involved in this suit.
We conclude that the judgment below is without error and should be affirmed:
It is so ordered.
ERVIN, C.J., and DREW, CARLTON and BOYD, JJ., concur.