**TOWN OF PALM BEACH, a municipal corporation, v.**
**PALM BEACH COUNTY, et al.**
No. 78-3978-CA (L) 01 B
**CITY OF WEST PALM BEACH, a municipal corporation, v.**
**PALM BEACH COUNTY, et al.**
No. 79-96-CA (L) 01 B
**CITY OF BOCA RATON, a municipal corporation, et al., v.**
**PALM BEACH COUNTY, et al.**
No. 79-1027-CA (L) 01 B
**THE VILLAGE OF NORTH PALM BEACH,**
**a municipal corporation of the State of Florida, et al., v.**
**PALM BEACH COUNTY and ALLEN C. CLARK,**
**Tax Collector of Palm Beach County,**
No. 79-3122-CA (L) 01 B
Circuit Court, Palm Beach County
July 3, 1981

---

10

John A. DeVault, III, Jacksonville, and W. Peter Burns, Palm Beach, for plaintiff Town of Palm Beach.

Carl V. M. Coffin, West Palm Beach, for plaintiff City of West Palm Beach.

M.A. Galbraith, Jr., City Attorney, for plaintiff City of Boca Raton.

Paul M. Sullivan, Jr. West Palm Beach, for plaintiff Village of North Palm Beach.

H. Michael Easley, West Palm Beach, for defendant Allen C. Clark.

Paul C. Wolfe, West Palm Beach, for intervenors.

Charles P. Vitunac, West Palm Beach, for defendant Palm Beach County.

JOHN D. WESSEL, Circuit Judge

Four municipalities within Palm Beach County levy charges that Palm Beach County is violating the State Constitution and Statutes in taxing properties located within their municipalities for services rendered exclusively for the benefit of residents in the unincorporated areas.

This Court has heard extensive evidence, including testimony, documentary evidence and arguments of counsel, and agrees with the challenge of these municipalities.

This action was brought in 1978 by the TOWN OF PALM BEACH, the CITY OF WEST PALM BEACH, the CITY OF BOCA RATON,

and the VILLAGE OF NORTH PALM BEACH, all municipalities within Palm Beach County. The cases at an early stage were consolidated for trial and for disposition. Prior to initiating the action, the plaintiffs filed, in compliance with the statutory requirements, resolutions from their municipalities with the Board of County Commissioners for Palm Beach County on their claimed violation of the 1968 Constitution and Florida Statutes.

Robert D. Apelgren and Joe Boynton sought intervention and was allowed; subsequently, a Motion to drop them as parties was considered by the Court and was denied.

The Plaintiff, the TOWN OF PALM BEACH, is a city located with boundaries on the west by the intercoastal waterway, or Lake Worth; on the north by the Palm Beach Inlet; on the east by the Atlantic Ocean; and on the south by the Town of Palm Beach. It has a population of approximately 10,000 persons, which increases seasonally to 30,000-35,000 persons. It is considered to be one of the world's most exclusive residential communities. It's governed by a City Manager type of government with its own full-service police, fire, emergency-medical technicians and public works, in addition to the other necessary administrative and support departments which normally are needed to run a municipality. It represents about 2% of the population of Palm Beach County.

The CITY OF BOCA RATON is a large geographical municipality bounded on the south by Hillsborough Canal (the south Palm Beach County line); on the north by what is referred to as the C-15 Canal; on the east by the Atlantic Ocean; on the west, a meandering line that runs partly parallel with Congress Avenue and then Military Trail to the south end to the Hillsborough Canal. There is approximately ten acres of unimproved land which is part of Palm Beach County, referred to as a "pocket." The population ranges from 49,000 permanent residents to 65,000 during the winter months. The City has 850 employees and has had a police department since approximately 1925. It is considered one of the most rapid growth areas in Palm Beach County; its population represents approximately 10% of the population of Palm Beach County.

The VILLAGE OF NORTH PALM BEACH is a small municipality in the northern part of Palm Beach County. It is bounded on the north by PGA Boulevard; on the south by South Lake Boulevard; its eastern boundaries go as far as the Atlantic Ocean; and its western boundaries go as far west as the Seacoast Railroad tracks.

The fourth plaintiff, the CITY OF WEST PALM BEACH, is a municipality located west of the Intercoastal Canal, which is its east

boundary, and runs as far west as to a water catchment area, west of the Florida Turnpike; bounded on the north by the City of Riviera Beach and on the south by the City of Lake Worth. Its population is represented by approximately 19% of the residents of Palm Beach County, and it is the seat of County Government.

The intervenors are residents of West Palm Beach, and North Palm Beach, and own property in the western agricultural area of Palm Beach County commonly referred to as "The Glades."

The Defendant in this action is the COUNTY OF PALM BEACH, one of the 67 counties which comprise a subdivision of the State of Florida.

The County has a population in excess of 550,000 and within the County are incorporated areas which comprise approximately 67% of the population of the County. There are, within the County, residents who reside outside of municipalities in unincorporated areas of approximately 33%. The County is an extremely large and diverse area with various needs and services rendered to both the incorporated municipalities and the unincorporated areas, together with the extensive agricultural area which lies west of what is called the "urban corridor," which is that land east of the Florida Turnpike.

In addition, ALLEN CLARK, the Tax Collector of Palm Beach County, was named as a party in this action. However, by stipulation and agreement of parties, he was dropped as a party defendant.

## ISSUES SETTLED OR RESOLVED

Apparently through pretrial discussion, discovery, and negotiation, the parties have agreed that the following items will not be considered by the Court, although identified in various adopted Resolutions by the Plaintiff/municipalities and in their pleadings. The items which have been settled, or otherwise not be considered by the Court, and the reasons for their exlusion, are as follows:

1) The operation of County, Planning, Zoning and Building Department.
   Paid for by the permit fees.

2) Construction of subdivision street systems.
   Paid for by private developers.

3) Installation and maintenance of street lighting system.
   Paid for by private developers or property owners.

4) Construction and maintenance of storm-drainage systems, as related to the local road systems.
Paid for by property owner assessments.

5) Administration of solid-waste collection system.
Paid for by user fees.

6) Administration of land development programs.
Paid for by user fees.

7) Planning acquisition, construction, maintenance and operation of water and sanitary sewer utility systems.
Paid for by user fees.

8) Rural lot cleaning program.
Paid for by assessments to lot owners.

9) Administration of five central tax districts.
Paid through special taxing districts.

10) Animal control program.
Abandoned by the City of Boca Raton.

11) General administration for the County Commission, the County Administrator, the County Attorney, Radio Communications System, and Finance office.
Determined a county-wide benefit for all residents of the County, incorporated and unincorporated.

12) Regional Community parks, including oceanfront parks.
Determined a county-wide benefit for the benefit of all residents of the County, incorporated and unincorporated.

13) Construction and maintenance of county roads and bridges on the classified county road system.
Determined a county-wide benefit for all residents of the county, incorporated and unincorporated.

14) The Sheriff's Office, including overhead, communications, and administration, except for the road patrol and detective divisions.
Determined a county-wide benefit for all residents of the County, including the incorporated municipalities and the unincorporated parts of the county.

15) The Aquatic Weed and Mosquito Control programs.
Determined a county-wide benefit for the incorporated and unincorporated residents.

## ISSUES TO BE DETERMINED

Those issues left unresolved for this Court to determine are whether the following identified programs, provided by Palm Beach County and financed from county-wide ad valorem revenue, provide a constitutionally permissible, real and substantial benefit to the residents of the Plaintiffs as indicated herein.

1) The Sheriff's road patrol, including related administrative and overhead expenses, as it applies to the Town of Palm Beach, the City of Boca Raton, the City of West Palm Beach, and the Village of North Palm Beach;

2) The detective and investigative division of the Sheriff's office, including related administrative and overhead expenses, as it applies to the Town of Palm Beach, the City of Boca Raton, the City of West Palm Beach, and the Village of North Palm Beach;

3) The county engineering department, all services for the construction and maintenance of county roads and bridges, not on the classified county road system, including, but not limited to, engineering, road and bridge administration, surveys, designs, and land acquisition, street signs, traffic signs, striping, signal installation, operation and maintenance, as it applies to Town of Palm Beach, City of Boca Raton, the City of West Palm Beach, and the Village of North Palm Beach;

4) The Parks and Recreation construction and maintenance of *neighborhood* parks and recreation areas as they *apply only* to the Town of Palm Beach and the City of West Palm Beach.

This case was set for trial before the Honorable Rosemary Barkett on February 11, 1980. However, the County Commission, in an effort to resolve this cause on a political basis established on September 17, 1979, the Palm Beach Fair Tax Council. The Council was composed of two members residing within the municipalities, two members residing in the unincorporated areas, and one member selected unanimously by these four members. The trial set before Judge Barkett was continued, awaiting an acceptable solution from recommendations of the Council in a final report to the Board of County Commissioners. This report was rejected without explanation. The cause was then reset for trial by this Court on January 12, 1981, and concluded with final arguments in February, 1981.

## STATEMENT OF THE LAW APPLICABLE

Article VIII, Section 1(h) of the 1968 Constitution provides:

"Taxes—limitation. Property situate within municipalities shall not be subject to taxation for services rendered by the county exclusively for the benefit of the property of residents in unincorporated areas."

Implementing legislation of this constitutional provision was enacted in 1974 as Section 125.01, in part—

"6(a) The governing body of municipalities or municipalities by resolution, or the citizens of a municipality or county by petition of 10% of the qualified electors of such unit, may identify a service rendered specially for the benefit of the property or residents in unincorporated areas and financed from county-wide revenues and petition the board of county commissioners to develop an appropriate mechanism to finance such activity, which may either be by taxes, special assessments, or service charges levied solely upon residents or property in the unincorporated area, by the establishment of a municipal service taxing or benefit unit pursuant to Paragraph (q) of subsection (1), or by remitting the identified cost of service paid by the tax levied upon property situated within the municipality or municipalities to the municipality or municipalities."

Because of a decision in *Manatee County v. Town of Longboat Key*, 365 So.2d 143 (Fla. 1978), the Florida Legislature amended the above provision to clarify the revenues which may be subject to the constitutional prohibition.

"125.01 (6)(a) The governing body of a municipality or municipalities by resolution, or the citizens of a municipality or county by petition of 10 percent of the qualified electors of such unit, may identify a service or program rendered specially for the benefit of the property or residents in unincorporated areas and financed from countywide revenues and petition the board of county commissioners to develop an appropriate mechanism to finance such activity for the ensuing fiscal year, which may be by taxes, special assessments, or service charges levied or imposed solely upon residents or property in the unincorporated area, by the establishment of a municipal service taxing or benefit unit pursuant to paragraph (q) of subsection (1), or by remitting the identified cost of service paid from revenues required to be expended on a countywide basis to the municipality or municipalities, within 6 months of the adoption of the county budget, in the proportion that

county ad valorem taxes collected within such municipality or municipalities bears to the total amount of countywide ad valorem taxes collected by the county, or by any other method prescribed by state law.

". . . (b) The board of county commissioners shall, within 90 days, file a response to such petition, which shall either reflect action to develop appropriate mechanisms or reject said petition and state findings of fact demonstrating that the service does not specially benefit the property or residents of the unincorporated areas.

". . . (7) No county revenues, except those derived specifically from or on behalf of a municipal service taxing unit, special district, unincorporated area, service area, or program area, shall be used to fund any service or project provided by the county where no real and substantial benefit accrues to the property or residents within a municipality or municipalities."'

Questions as to the interpretation of this constitutional provision arose immediately after the adoption of the 1968 Constitution in the *City of St. Petersburg v. Briley, Wild & Associates,* 239 So.2d 817 (1970), and prior to the implementing legislation of 1974.

In the *Briley* case, supra, the plaintiff sought to recover from Pinellas County costs of engineering services rendered on a contract between the parties for the expansion of sanitary sewer facilities. When Briley presented his bill for payment for services rendered, the County Auditor raised the issue of whether the payment of the services by general ad valorem taxation to construct sewerage facilities in unincorporated areas of the county was violative of Article III, Section 1(h), supra.

The City of St. Petersburg and other intervened to contest the authority of the County to spend funds derived from this revenue source, and that which began as a friendly suit concluded in a bitter fight between the Pinellas County and St. Petersburg residents.

The trial Court concluded the proposed sewerage sanitation plant, prepared according to the plan of the county by the plaintiff, was beneficial in eliminating pollution, therefore benefiting all of the areas of the county, both incorporated and unincorporated. The Supreme Court in affirming the trial court's decision, answered some important questions as to the interpretation of this 1968 Constitutional Revision. In doing so, it went to great lengths to interpret specifically that phrase of the provision which states "exclusively for the benefit of the property or residents in unincorporated area." In giving effect to this language

and meaning, the Court said it could not give a literal interpretation for, to do so, any measured benefit either in quantity or quality could make an attack on this constitutional prohibition futile, which would be contrary to the mandate of the people who enacted this provision.

Concluding that this constitutional provision prohibits the taxation of municipally situated property by the county for any services rendered where no real or substantial benefit accrues to the city property from such services, the Supreme Court went on to say that it could conceive of services rendered by a county within an unincorporated area which would have no consequential benefits to a municipality, and gave several examples including a library system, a park or recreational facilities, a fire-fighting facility, but found that in a public-health facility, such as a sewer/sanitation and pollution control system, as the one in Pinellas County, that the proscription of Article VIII, Section 1(h) was not applicable.

The Court said,

"if the benefits accruing to municipal areas are found to be real and substantial and not merely illusory, epheremeal and inconsequential," Page 823.

It was not the intent of the framers of this provision of the Constitution to require a direct benefit to city-located property in order to avoid the proscription as evidenced by the fact that attempts to amend the provision to substitute the words "directly" and "primarily" for the word "exclusively" were defeated before the proposition was submitted to the people for approval. Supra. Pg. 823-824.

In *Burke v. Charlotte County,* 286 So.2d 199 (1973), the City of Punta Gorda in Charlotte County attacked the Charlotte County ordinance on the constitutional grounds that the ordinance sought to levy an ad valorem tax upon municipal property owners for the construction of improved streets, claiming that *the ordinance* violated the constitutional prohibition of Article VIII, Section 1(h). The Court, following the *Briley* decision, cited supra, concluded with the trial Court that the County ordinance was not in contravention of Article VIII, Section 1(h), on its face.

Subsequently, in *Alsdorf v. Broward County,* 333 So.2d 457, (1976), referred herein as Alsdorf I, the trial Court dismissed the case with prejudice on the grounds that the legislature failed to provide standards and guidelines to aid municipalities in dealing with this constitutional provision. The Supreme Court's interpretation of *Briley,* supra, indicated that trial courts and appellate courts cannot abdicate their responsibility in following the will of the people because of the complexity, or the

absence of constitutional mandate, notwithstanding the judicial labor required to separate that which is permissible from that which is impermissible. It concluded this constitutional provision was self-executing and for the trial court to exercise its inherent equitable powers to fashion a suitable remedy for the resolution of this controversy.

On remand, in *Alsdorf v. Broward County,* 373 So.2d 695 (4th DCA 1979), referred herein as Alsdorf II, the Fourth District, through Judge Beranek, affirmed the trial Court's resolution of this matter on remand after disposing of a knotty procedural problem with regard to a stipulation entered into between the county and the plaintiffs. Essentially, the 4th DCA found the Court's judgment as to the circumstances were supported by the evidence.

Judge Beranek in Alsdorf II made some interesting observations in his conclusion, which this Court must apply in this case, when it stated:

> "We conclude by stressing the continued existence of the provision in the Florida Constitution which prohibits the taxation of municipal property for services rendered exclusively for the benefit of unincorporated areas. With this provision we cannot, and do not, disagree. Accordingly, this *decision* is *limited* to the *facts, taxable years* and *circumstances* of this *particular case* and should not be hailed as a precedent, providing "carte blanche" approval of any tax levied on municipality property. The relationship between individual cities and counties and the services provided by county agencies to municipal residents will continue to change based upon development and expansion of areas and programs. What has been proper for any given tax period is subject to appropriate change and re-evaluation." Pg. 701 (Emphasis supplied)

The Supreme Court denied certiorari at 385 So.2d 754.

In *Manatee County v. Town of Longboat Key,* 352 So.2d 869 (2 DCA 1977), the Second District Court of Appeal was faced with the question of whether the trial Court could properly direct a county in which Article VIII, Section 1(h) prohibitions existed to form a taxing district to correct the inequities. The Second District held it did not have that power, and further outlined the procedure in which the counties would make redeterminations as to what revenues are to be allocated to the various services under the mandate of earlier Supreme Court decisions in *Alsdorf I.* The Supreme Court, on review of the Second District opinion, concluded that Article VIII Section 1(h) applied only to property taxation and that money judgments may not be entered against the county for past years, and that a taxpayer is not an indispensable party to an action under Section 125.01(6).

In the *City of Ormond Beach v. County of Volusia,* the issue presented to the Court was whether Volusia County could levy a library tax on properties within the boundaries of the City of Ormond Beach which owned and operated its own library. The City maintained that under the constitutional mandate an imposition of an ad valorem tax for a county library without any compensatory advantage to the City taxpayer would be violative of Article VIII, Section 1(h). The Fifth District reviewing *Briley* and *Alsdorf II,* found that the trial judge's conclusion was supported by competent and substantial evidence and the mere existence of a countywide library concurrent with the fact the City paid and operated its own library does not preclude the county from levying a countywide ad valorem tax for a countywide library system which serves residents of municipalities and unincorporated areas alike.

## CONCLUSIONS

In sum, since the enactment of Article VIII, Section 1(h) in 1968, and its interpretation in *Briley,* supra, the law and constitutional mandate of this State has been that city property could not be taxed to finance services for unincorporated areas if there is no real or substantial benefit to that city property. The Supreme Court and all of the Appellate Courts in Florida have adhered to this principle religiously. This Court, in fashioning its conclusions to the facts, circumstances and peculiarities in this case, is based upon this principle of law. This Court is mindful of the complex problems, both practical and fiscally created by the imposition on counties which have ignored this principle.

This constitutional mandate does not prohibit dual taxation (a misnomer), but does prohibit taxation of municipalities for services rendered to unincorporated areas where there is no real or substantial benefit to those municipalities. It also does not prohibit a county from duplicating a service to a municipality which is engaged in the same type of service as long as there is some substantial and real benefit to the municipal residents being taxed for those benefits.

## STATEMENT OF FACTS PERTAINING TO THE ISSUES

The evidence supports the services of the road patrol and the detective division of Palm Beach County, which are identifiable and separate services. This does not suggest that other services of the Sheriff's Department are included in this classification. Those excluded from this identifiable class consist of, but are not limited to, aviation, harbor patrol, airport, crime lab, K-9, bomb squad, communications, jail maintenance, corrections, stockade and various and sundry other services. The evidence indicates the Sheriff conducts no routine patrol in the Town of Palm Beach. There were three occasions when

the Sheriff was called. Examples of those occasions are, use of the helicopter, the K-9 corp, and the bomb squad unit. Municipal officers are trained and handle all of the law enforcement problems which occur in the Town of Palm Beach. The City of Boca Raton has a full-time police force and patrols the municipality within its jurisdiction. The Sheriff's road patrol does not patrol the City of Boca Raton, nor is the detective division used in resolving any law enforcement problems. The City of Boca Raton has a fully trained patrol and detective division, along with other divisions, including a marine patrol and bomb squad, and a central dispatch station. The City of West Palm Beach has a full service police department. The Sheriff's Department does not patrol within the City of West Palm Beach. The City of West Palm Beach has a fully staffed detective and investigative unit which is prepared to handle any and all types of crime or criminal activities.

The Village of North Palm Beach has a fully staffed patrol and detective division. From 1977 forward they have been handling their own investigations. The Sheriff's patrol does not patrol there, and the Sheriff's detectives have not been called in for investigations since 1977.

The evidence indicated the Sheriff maintains certain types of records which registers the services rendered by the road patrol and detective division, and any assistance rendered by the Sheriff to or in any or all municipalities or, for that matter, the county are accounted for by these records.

The testimony revealed by expert testimony that assists to these four municipalities was as follows:

"Sheriff's Assists/Complaints"
(FY 1977-78—FY 1979-80)

|  | FY 1977-78 | | FY 1978-79 | | FY 1979-80 | |
|---|---|---|---|---|---|---|
|  | No. | % | No. | % | No. | % |
| Boca Raton | 36 | 0.06 | 18 | 0.02 | 26 | 0.03 |
| North Palm Beach | 16 | 0.02 | 12 | 0.02 | 15 | 0.02 |
| Palm Beach | 17 | 0.03 | 5 | 0.01 | 5 | 0.01 |
| West Palm Beach | 114 | 0.17 | 72 | 0.09 | 109 | 0.12 |
| Total | 183 | 0.28% | 107 | 0.14% | 155 | 0.17% |

This expert testified and summarized the compilation of this data, which is supported by the greater weight of the evidence and is also supported by the Sheriff's own statement that the records of their Department are an important part of the job of Sheriff. Although there

was extensive cross-examination of this expert by counsel for the Defendant, his testimony withstood it admirably.

The County claims the records are insufficient. Their position is that they can maintain records of such quantitative nature but do not have to stand behind those records and, indeed, they can attack their own record-keeping ability. This Court cannot accept such an untenable position. These records show the following law enforcement activity in the municipalities and the county.

Law Enforcement Activity Within Municipalities
FY 1979-80 (PX 16, Chart 4)

|  | (1) No. By Police Dept. | (2) Total No. By Sheriff | (3) Patrol & Detect. By Sheriff | (4) Total (1+2) | (5) Percent by Police Dept. (1÷4) | (6) Percent By Sheriff Patrol & Detect. (3÷4) |
|---|---|---|---|---|---|---|
| Boca Raton | 34,727 | 119 | 46 | 34,846 | 99.66 | 0.13 |
| North Palm Beach | 5,764 | 67 | 30 | 5,831 | 98.85 | 0.51 |
| Palm Beach | 19,391 | 22 | 5 | 19,413 | 99.89 | 0.03 |
| West Palm Beach | 82,236 | 255 | 159 | 82,491 | 99.69 | 0.19 |
| Total | 142,118 | 463 | 240 | 142,581 | 99.68 | 0.17 |

It is apparent from the above charts that, of the 142,581 recorded law enforcement activities within the municipalities, the four municipalities which claim no substantial or real benefit had a total of 240 assists from the patrol and detective divisions, which means their participation is less than one-fifth of one percent. It's difficult for this Court to conclude, based upon this evidence, that the Sheriff's road patrol and detective division adds anything more than an inconsequential benefit to the four municipalities involved herein.

It should be pointed out this issue does not involve the professionalism of either the Sheriff or municipalities' law enforcement agencies. Sheriff Wille testified himself, he considered the municipal law enforcement agencies as "equals among equals."

The testimony of the Sheriff and his various department heads indicates that the Sheriff's road patrol is a response type of reactive operation, and the road patrol deputies do not have a luxury of time, equipment and personnel. Further, in conjunction with the limited available resources, together with the large areas for which they are responsible in the unincorporated areas, their testimony indicates that

their Department is not desirous of work beyond that which is mandatory in this regard. It is a matter of unrebutted testimony the Sheriff introduced various contracts which have been entered into for support services for various municipalities and private entities which request truly patrol type services, requiring more than a reactive or response-to-call operation.

The patrol division is divided into four parts—north, south, central and west; there is a standard policy in the Sheriff's Office that the Sheriff's patrol division will not go into a municipality unless it is specifically requested. The evidence further indicates that, because of the growth in the unincorporated areas, the Sheriff's road patrol is pressed to its limits. Although the Sheriff is responsible countywide for law enforcement, if these municipalities terminated their municipal police forces, the activity of the 142,000 complaints presently responded by the four municipalities could not be handled.

The detective division of the Sheriff's Office basically handles the follow-up of criminal investigation, and is often assisted by the road patrol. There was some testimony by the former chief of police of Boca Raton that the Sheriff's Office participated in an investigation of a murder in that City. The police chief indicated it was a jurisdictional dispute, and both departments participated in the investigation.

The Defendant County maintains the benefits rendered to· the municipalities include serveral areas.

The Sheriff has made statements previously which indicated that 90% of the road patrol's time was spent in unincorporated areas and that 10% of the time was spent in all the municipalities of Palm Beach County. There was no breakdown as to the percentage he estimated as to the four plaintiff/municipalities.

The Sheriff maintains there is property which was stolen from municipalities that was recovered in an unincorporated area, but there were no statistics, other than those compiled by the Plaintiffs' experts, which substantiated the quantity. In addition, the Defendant maintains that crime knows no boundaries and the mere presence of the road patrol in the unincorporated areas is of benefit to those four municipalities.

The generalized nature of this testimony makes its credibility suspect and conclusionary at best. In the view of the Court, it would be analogous to saying the FBI, the National Guard, and the Army play a substantial role under the constitutional mandate to apply the benefits derived from the county taxation of· municipal property for services in the unincorporated areas. This argument and theory is illusory.

There was also testimony to the effect that the Sheriff's patrol deputies take their automobiles home, and this creates a presence which is of some protective value to the four municipalities. There was no evidence, whatsoever, to support the implication that any of the deputies lived in these municipalities, and, in fact, the Sheriff justified this type of utilization to the County Commission as an effort to reduce maintenance costs to the County. Furthermore, the expert testimony was in conflict regarding this issue; the former chief of Boca Raton Police Department indicated the City of Boca Raton rejected this concept because law enforcement benefits were tenuous due to the fact that most of the police officers do not reside in that jurisdiction. Accordingly, we can accord little weight to that concept.

The Defendant maintains the standby capacity of the Sheriff is a benefit. Many of the municipalities stated that if the standby capacity were needed, it would be called from a neighboring municipality and not from the Sheriff's Office. There is no evidence that this standby capacity was used, or has ever been called upon. It's benefit is ephemeral.

The greater weight of the evidence, indeed the clear and convincing force of the evidence, supports the position of the four municipalities that the road patrol and detective division of the Sheriff of Palm Beach County adds no real or substantial benefit to the municipalities of the Town of Palm Beach, City of Boca Raton, City of West Palm Beach, and the Village of North Palm Beach. Any benefits which exist are, at best, inconsequential.

Evidence indicates that the County has a system of classified and non-classified roads. The testimony indicates that these non-classified roads are mainly those subdivision roads maintained and in existence primarily for the benefit of abutting property owners. There is some testimony that, by utilization of these roads, one could go from point A to point Z, over a rather circuitous route; however, most of the roads, as were indicated, are unpaved. The County Engineer testified that some roads carry large quantities of traffic; however, this testimony did not negate the fact that they were for the benefit of the abutting property owners who utilized them.

After carefully reviewing the evidence, this Court finds the engineering road and bridge administration surveys and designs, and land acquisition for the maintenance and operation of those roads and bridges, not on the classified system and provide no real or substantial benefit to the residents of the four plaintiff/municipalities.

The Court finds that the evidence does support that the position of the street signs, traffic signs, striping, signal installation, operation and maintenance of the unclassified roads do not provide a real and substantial benefit to the residents throughout Palm Beach County, and particularly of the residents of the four plaintiff/municipalities.

A neighborhood park is a small park within walking distance within the community in which it is located. It is up to approximately five acres in size and is designed to service only the neighborhood in which it is located.

The City of Boca Raton and the Village of North Palm Beach do not challenge this issue, and it applies only to the Town of Palm Beach and the City of West Palm Beach.

There are no neighborhood parks located in the Town of Palm Beach. There is one neighborhood park located in the City of West Palm Beach,[1] which the parties concede does provide countywide benefit.

The Court, having reviewed the evidence concerning the neighborhood parks, finds the neighborhood parks provide no real or substantial benefit to the City of West Palm Beach and the Town of Palm Beach, except for Byrd Park. Accordingly, Palm Beach County is in violation of the constitutional prohibition of taxing the residents of these two municipalities for services which are of no benefit or use to them. The benefits ascribed are, at best, illusory.

Defendant's counsel argues this is merely a ''political'' case. He may be right inasmuch as any case dealing with taxation is unavoidably political. The Defendant has had ample opportunity to resolve this case within the political framework. What is before this Court is the application of the facts adhering to those principles of law mandated by Article VIII (1)(h) of the 1968 Constitution, *Briley,* supra, and its progeny; hence purely legal determination. Unfortunately, the Courts again are required to be interjected into these issues, notwithstanding the body politic having the same principles of law available to them, but refusing to respond.

FINALLY, this Court in concluding as it does that Defendant, PALM BEACH COUNTY, is in violation of the Florida Constitution of 1968, Article VIII (1)(h) as to those identifiable services rendered, the Defendant

---

[1]The Court will take judicial notice, although not part of the record, that one park which is Byrd Park is adjacent to the Courthouse. While this case has been under submission, the park has been destroyed to make way for the Administrative Complex of the County.

County will be directed to devise by appropriate means or mechanism provided by statute to discharge its constitutional responsibility in a manner or means constitutionally acceptable, and this Court will reserve its inherent equitable jurisdiction to assure the plaintiff/municipalities this is achieved for ensuing years.

IT IS ORDERED AND ADJUDGED:

1) The Defendant, PALM BEACH COUNTY, is hereby declared to be in violation of Article VIII (1)(h), Florida Constitution of 1968, in the taxation of the property of

   (a) municipal/plaintiffs of the TOWN OF PALM BEACH, CITY OF BOCA RATON, CITY OF WEST PALM BEACH and VILLAGE OF NORTH PALM BEACH for the services of;

      i. Sheriff of Palm Beach County Road Patrol (including administrative and overhead expenses);

      ii. Detective and Investigative Division of Sheriff's Department (including administrative and overhead expenses).

      iii. County Engineering Department, all services for the construction and maintenance of County roads and bridges *not on the classified* county road system;

   (b) as to the Plaintiffs, TOWN OF PALM BEACH and CITY OF WEST PALM BEACH:

      iv. Park and Recreation—construction and maintenance of neighborhood parks and recreation area,

   for all of which the Court finds no real or substantial benefit to the named Plaintiff/municipalities.

2) The Defendant, PALM BEACH COUNTY, is directed to develop or adopt within thirty (30) days from the date of this Order an appropriate mechanism to alleviate, correct, and make right those unconstitutional acts described herein for the ensuing fiscal years;

3) This Court retains jurisdiction to exercise this Court's inherent equitable authority to enforce all of the provisions of this Order, and any other necessary orders, and to assess costs if there be any.