355 So.2d 1197 (1978)
SARASOTA COUNTY, Florida, and Mary J. Orr, As Supervisor of Elections, Appellants,
v.
TOWN OF LONGBOAT KEY, Florida, City of Sarasota, Florida, City of Venice, Florida, and City of North Port, Florida, Appellees.
No. 52214.
Supreme Court of Florida.
January 19, 1978.
Rehearing Denied March 16, 1978.
*1198 Richard E. Nelson, Richard L. Smith and Leslie Telford, of Nelson, Hesse, Cyril & Weber, Sarasota, and Talbot D'Alemberte and Donald M. Middlebrooks, of Steel, Hector & Davis, Miami, for appellants.
John R. Wood and I.W. Whitesell, Jr., of Wood, Whitesell & Karp, Sarasota, for Town of Longboat Key.
William C. Strode and William M. Hereford, of Strode, Hereford & Taylor, Sarasota, for City of Sarasota.
Charles F. Wheeler, of Korp & Wheeler, Venice, for City of Venice.
Allen J. Levin, Port Charlotte, for City of North Port, appellees.
Ralph A. Marsicano, Gen. Counsel, for Florida League of Cities, Inc., Tampa.
Burton M. Michaels, Staff Atty. for Florida League of Cities, Inc., Tallahassee, amicus curiae.
ENGLAND, Justice.
The Sarasota County Commission adopted an ordinance proposing five amendments to the county charter which would transfer the responsibilities for performing five distinct governmental functions from four Sarasota County cities to the county.[1] Four of the affected cities challenged the proposed amendments in court before they could be voted on by the residents of Sarasota County,[2] and in due course they obtained from the Twelfth Judicial Circuit Court a permanent injunction prohibiting the referendum on the dual grounds that the ordinance attempts an unconstitutional "consolidation" in violation of Article VIII, Section 3 of the Florida Constitution, and is unconstitutionally vague.[3] Inasmuch as the trial court construed a provision of the Constitution, appeal of the trial court's ruling to this Court is appropriate.[4]
The five proposed amendments adopted by the County Commission are identical in their terminology except for the delineation of the different services and functions in each. The first reads:
"Section 1.4: Consolidation of Air and Water Pollution Control Services and Functions.

Notwithstanding any other provision of this Charter, all municipal air and water pollution control services and functions and all county air and water pollution control services and functions shall be consolidated and provided by this county government. The Board of County Commissioners shall have power to carry out and enforce this section by appropriate ordinances which, notwithstanding any other provision of this Charter, shall prevail over any municipal ordinances in conflict therewith."
*1199 Significant principles of local government autonomy are at stake in this proceeding. The cities seek to enjoin a voter referendum on these amendments out of a general concern that municipalities could be effectively abolished if a county government were free to propose for county-wide voter approval, and without the separate approval of the affected municipality's voters, the transfer of city functions to the county level of government.[5] The respective concerns of the cities and the county quite naturally implicate several provisions of the Florida Constitution.
At the heart of this controversy is Article VIII, Section 3 of the Florida Constitution, entitled "Consolidation", which describes the manner in which the governments of counties and municipalities may be consolidated.[6] Of equal importance in our consideration of the issues presented is Article VIII, Section 4 of the Florida Constitution, entitled "Transfer of powers", which specifies the method by which any function or power of a county or municipality may be transferred to or performed by another governmental unit.[7] Also relevant to these proceedings are subsections 1(f) and 1(g) of Article VIII, Florida Constitution, which define the limit of powers for non-charter and charter governments, respectively.[8]
The major contentions of the parties are more easily understood if each is discussed separately.

1. Does the ordinance propose a "consolidation" under Article VIII, Section 3?
The trial judge enjoined a county-wide voter referendum of the five amendments on the grounds that a "consolidation" of municipal services into the county would result, and that the amendments obviously do not comport with the requirement of Article VIII, Section 3 to the effect that consolidation must be proposed by "special law". We disagree with the trial court's premise, for despite their denomination by the Sarasota County Commission as "consolidation" amendments, it is apparent that the proposed amendments do not effect a consolidation within the meaning of Article VIII, Section 3. The process provided in that provision is the unification of the government of a county and the government of one or more municipalities "into a single government", which would then exercise the powers previously held by both or all of the consolidated units. This provision of the Constitution applies only when one or more of the underlying governments disappears *1200 or is merged into the government of the surviving unit.[9]

2. Is the ordinance unconstitutionally vague?
The trial judge specifically held that the proposed charter amendments were vague, in that they did not specify the manner in which property, services or functions would be transferred from the cities to the county. Although it is true that the proposed amendments provide no roadmap for the assignment of functions or the transfer of property or monies as between the municipalities and the county, we do not find that omission to be a basis to strike them as unconstitutionally vague. The amendments are not self-executing. They specifically provide that additional ordinances will be adopted to implement the proposal when and if the voters of the county approve the transfers. We think it is permissible to proceed in this fashion, and that the orderly processes of government initially require no more than a determination of the proper place for the functions to be assigned. To require that details be precisely defined before the voters may approve a transfer of functions would burden county commissions with potentially unnecessary minutiae which, even at the approval stage, might require additional litigation.[10] The amendments are not "clearly and conclusively defective" by reason of vagueness.[11]

3. Does the ordinance constitute an attempted transfer of powers under Article VIII, Section 4?
The trial judge did not expressly rule on the cities' contention that the County Commission has essentially proposed a transfer of powers, a procedure governed by Article VIII, Section 4 of the Constitution. The municipalities, joined by the Florida League of Cities, reassert that argument here. None of the parties seriously disputes the notion that this proceeding really involves a proposed transfer of functions between different units of government. The cities simply claim that the county's ordinance does not comply with Article VIII, Section 4 since it was initiated neither "by law" nor by resolution of all affected governments. Sarasota County suggests that charter counties are excluded from Article VIII, Section 4 by reason of Article VIII, Section 1(g), or alternately that the transfer requirements of Article VIII, Section 4 are met by Section 125.86(7), Florida Statutes (1975).[12] For the following reasons we conclude that the cities' position is the correct one.
*1201 The county suggests that because it operates under a charter form of government, Section 1(g) of Article VIII alone governs its powers. We do not agree. Section 4 of Article VIII refers to "counties", without distinction. The same term is used throughout the Constitution to refer both to charter and to non-charter counties.[13] Where there has been an intent to distinguish the two forms of county government, it has been done explicitly.[14] Not only are we disinclined to read into Section 4 something that is not expressly provided, but we are all the more reluctant to elevate the general provisions of Article VIII, Section 1(g) to a dominant position over the specific provisions of Article VIII, Section 4. We hold that Section 4 applies both to charter and non-charter counties.
We also reject the county's assertion that Article VIII, Section 4 contemplates a law of general applicability such as Section 125.86(7), by which counties may accomplish the transfer of municipal functions by county resolution. A plain reading of Article VIII, Section 4 reflects that a transfer of governmental powers requires distinctive procedures for the initiation of a transfer, that is, "by law or by resolution of the governing bodies of each of the governments affected."[15] We think it clear from the specificity of the procedure in Section 4 that the "by law" reference connotes the need for a separate legislative act addressed to a specific transfer, in the same manner that two or more resolutions of the affected governments would address a specific transfer. Section 125.86(7), in contrast, does no more than provide general authority for county commissions to exercise police powers. It in no way provides "by law" the procedures necessary to initiate the transfer of governmental functions or powers.
We conclude, therefore, that Sarasota County's five proposed amendments constitute attempts to transfer powers and functions from the cities to the county within Article VIII, Section 4, but because the procedure by which the transfers have been proposed does not comport with the requirements of that Section, the county's resolution is ineffective for that purpose.
We affirm the order of the Circuit Court of Sarasota County permanently enjoining a referendum on the five proposed amendments.
It is so ordered.
OVERTON, C.J., and BOYD, SUNDBERG, HATCHETT and DREW (Retired), JJ., concur.
NOTES
[1] The functions to be transferred are air and water pollution control, parks and recreation, roads and bridges, planning and zoning, and police.
[2] The Town of Longboat Key joined in bringing the suit although it actually lies within both Sarasota County and Manatee County.
[3] The ordinance was originally adopted on an emergency basis on September 21, 1976, and scheduled for voter approval on November 2, 1976. The cities obtained temporary injunctive relief to prevent the November 2 referendum, which the county did not contest by certiorari to this Court until after that date. By an order dated February 25, 1977, we rejected that petition on the ground that the matter was moot. Subsequent to our ruling, a final hearing was held on the municipalities' challenge to the ordinance, and a permanent injunction was entered. During the litigation Sarasota County adopted resolutions postponing the date for a vote on the five amendments, originally setting April 5, 1977, and later setting November 8, 1977. After the final injunction was entered, the county brought a direct appeal here and moved to expedite the proceeding and to allow the expenditure of money in preparation for the November 8 referendum. Following emergency hearings on those motions, we declined to lift the permanent injunction, but we expedited the times for briefing and argument. At oral argument on November 4, we were told that the County Commission had scheduled a hearing for November 8 on a resolution to defer the election until September 1978, if the ordinance is found to be consistent with the Constitution.
[4] Art. V, § 3(b)(1), Fla. Const.
[5] The Florida League of Cities, Inc. has joined with the four municipalities in contesting the county's attempt to assume city functions without the approval of municipal residents.
[6] "Section 3. Consolidation.  The government of a county and the government of one or more municipalities located therein may be consolidated into a single government which may exercise any and all powers of the county and the several municipalities. The consolidation plan may be proposed only by special law, which shall become effective if approved by vote of the electors of the county, or of the county and municipalities affected, as may be provided in the plan... ."
[7] "Section 4. Transfer of powers.  By law or by resolution of the governing bodies of each of the governments affected, any function or power of a county, municipality or special district may be transferred to or contracted to be performed by another county, municipality or special district, after approval by vote of the electors of the transferor and approval by vote of the electors of the transferee, or as otherwise provided by law."
[8] "(f) NON-CHARTER GOVERNMENT. Counties not operating under county charters shall have such power of self-government as is provided by general or special law. The board of county commissioners of a county not operating under a charter may enact, in a manner prescribed by general law, county ordinances not inconsistent with general or special law, but an ordinance in conflict with a municipal ordinance shall not be effective within the municipality to the extent of such conflict.

(g) CHARTER GOVERNMENT. Counties operating under county charters shall have all powers of local self-government not inconsistent with general law, or with special law approved by vote of the electors. The governing body of a county operating under a charter may enact county ordinances not inconsistent with general law. The charter shall provide which shall prevail in the event of conflict between county and municipal ordinances."
[9] See, for example, Beard v. City and County of San Francisco, 79 Cal. App.2d 753, 180 P.2d 744 (Dist.Ct.App. 1947). Cf. City of Jacksonville Beach v. Albury, 291 So.2d 82 (Fla. 1st DCA 1973), aff'd, 295 So.2d 297 (Fla. 1974). Sarasota County argues in the alternative that were these transfers to be considered a consolidation under Art. VIII, § 3, then the ordinance would nonetheless comply with the "special law" requirement because it was adopted by a county which has a charter form of government. Although there is some logic in the suggestion that an ordinance of a charter county now provides the vehicle by which to adopt measures which before the 1968 Constitution required a special law, it is clear from the language of the Constitution that the term "special law" means an enactment of the Florida Legislature. Davis v. Gronemeyer, 251 So.2d 1 (Fla. 1971).
[10] By way of comparison, see Ch. 20, Fla. Stat., by which the 1969 Legislature consolidated the functions of over 100 departments, agencies and commissions into not more than 25 departments by simple transfer and assignment language. See Art. 4, § 6, Fla. Const.
[11] Cf. Weber v. Smathers, 338 So.2d 819 (Fla. 1976) (proposed constitutional amendment upheld against an attempt to enjoin its placement on the ballot).
[12] This section grants the board of county commissioners the power to:

"Adopt pursuant to the provisions of the charter, such ordinances of county-wide force and effect as are necessary for the health, safety, and welfare of the residents. It is the specific legislative intent to recognize that a county charter may properly determine that certain governmental areas are more conducive to uniform county-wide enforcement and may provide the county government powers in relation to those areas as recognized and as may be amended from time to time by the people of that county[.]"
[13] See, for example, Art. VII, §§ 9 and 10, and Art. VIII, § 1, Fla. Const.
[14] Compare Art. VIII, §§ 1(f) and 1(g), Fla. Const.
[15] Procedures for the approval of a transfer are either a vote of the electors of both the transferor and transferee, or "as otherwise provided by law". The latter phrase does not describe an alternate method for initiating a transfer; it addresses only the means for approval. The Florida League of Cities notes that a proposed amendment to Art. VIII, § 4  not adopted by the 1966 Constitution Revision Commission  would have added the words "unless otherwise provided by charter" at the end of the paragraph. This, the League indicates, conclusively shows that the Commission rejected the transfer of municipal powers simply by county resolution. Whatever the effect of this action by the 1966 Commission, it does not involve the initiating requirements in Art. VIII, § 4.