Mr. Allen J. Levin Legal Counsel Port Charlotte-Charlotte Harbor Fire Control District Suite A 209 Conway Boulevard, N.E. Port Charlotte, Florida 33952
Dear Mr. Levin:
This is in response to your request for an opinion on substantially the following question:
 MAY AN INDEPENDENT FIRE CONTROL DISTRICT, CREATED BY SPECIAL ACT OF THE LEGISLATURE, BE DISSOLVED, MERGED OR CONSOLIDATED BY COUNTY ORDINANCE OR BY SPECIAL ACT OF THE LEGISLATURE WITHOUT A REFERENDUM OF THE QUALIFIED ELECTORS OF THE DISTRICT AND OF THE COUNTY AT LARGE?
The Port Charlotte-Charlotte Harbor Fire Control District was established pursuant to Ch. 65-1355, Laws of Florida, as amended by Chs. 67-1197, 74-456, 75-355, 77-524, 81-356 and 82-276, Laws of Florida. See, s 1(a), Ch. 65-1355, creating the special fire control district as a public municipal corporation. I understand from a telephone conversation with your office that only unincorporated areas of Charlotte County are included within the district's boundaries. The district, which is governed by a board of six commissioners appointed by the governor, see, s 2, Ch. 65-1355, as amended, is authorized to assess and levy ad valorem taxes against the taxable real estate in the district to provide funds for the purposes of the district. See, s 4, Ch. 65-1355, as amended by s 1, Ch. 77-524, Laws of Florida. According to your letter, the board of county commissioners of Charlotte County is seeking, either by special act of the Legislature or under the county's home rule powers, to consolidate several independent fire control districts, including the Port Charlotte-Charlotte Harbor Fire Control District, into a county wide fire department. You therefore inquire whether a referendum of the electors of the district approving such an action is required.
Section 4, Art. VIII, State Const., states:
 By law or by resolution of the governing bodies of each of the governments affected, any function or power of a county, municipality or special district may be transferred to or contracted to be performed by another county, municipality or special district, after approval by vote of the electors of the transferor and approval by vote of the electors of the transferee, or as otherwise provided by law.
The authority to transfer or contract out local governmental functions or powers is thus tempered by the requirements of s 4, Art. VIII, that the transfer or contract be initiated by law or by resolution of the governing body of each of the governmental units affected. The term `by law' as used in s 4, Art. VIII, has been determined by the Florida Supreme Court to connote the need for a separate legislative act addressing a specific transfer in the same manner as two or more resolutions of the affected governments would address a specific transfer. See, Sarasota County v. Town of Longboat Key, 355 So.2d 1197 (Fla. 1978), wherein the court held that laws of general applicability, such as s 125.86(7) which provided general authority for the county commission to exercise police powers, were not sufficient to meet the `by law' requirement of s 4; thus a county ordinance transferring responsibility to Sarasota County was held to be ineffective since it was not initiated by law or by resolution of the governing body of each of the governments affected nor separately approved by the affected municipalities' voters as required by s 4, Art. VIII. In addition, the court concluded that the phrase `as otherwise provided by law' did not describe an alternative method of initiating a transfer but only addressed the means of approval. See, 355 So.2d at 1201 n. 15.
A transfer of functions or powers from the special district to the county may therefore be accomplished either by resolution of the district's board of commissioners and of the board of county commissioners approved by vote of the electors of the respective governmental units or by special act of the Legislature specifically addressing the transfer. Pursuant to s 4, Art. VIII, the Legislature may prescribe an alternative method (other than approval by the electorate of the governmental units affected) for approval of such actions. While s 10, Art. III, State Const., requires that before a special law may be effectively passed, one of two things must have occurred: (1) the intention to seek enactment of a special act must have been published as prescribed by law or (2) the law must contain a referendum provision and the effectiveness of the special act must depend upon a favorable vote in the referendum, the conditions precedent prescribed therein are alternative means of providing notice to the affected persons regarding the enactment of a special law. Thus a referendum is not required under s 10, Art. III, if there has been notice of the intention to seek enactment of the special law published in the manner provided by general law. See, AGO 81-73 stating that the fact that the original enabling legislation required approval by vote of the electors of an effected area did not mandate that a referendum be held to approve amendatory legislation such as proposed legislation to contract the boundaries of a special tax district. Accord, AGO 77-40.
Chapter 165, F.S., as amended, the Formation of Local Governments Act, sets forth the exclusive procedure pursuant to general law for the formation and dissolution of municipalities and special districts in this state except in those counties operating under a home rule charter which provides an exclusive method as authorized by s 6(e), Art. VIII, State Const. See, s 165.022(1), F.S. (1982 Supp.) And see, s 165.031(5), F.S. (1982 Supp.), which defines for the purposes of Ch. 165 the term `special district' as `a local unit of special government . . . created pursuant to general or special law for the purposes of performing prescribed, specialized functions, including municipal service functions, within limited boundaries. . . .' Based upon the foregoing definition, it appears clear that the Port Charlotte-Charlotte Harbor Fire Control District is a `special district' as defined in s 165.031(5).
Mergers of existing municipalities or special districts are expressly included as one of the activities comprising the formation of local governments for purposes of Ch. 165, F.S., as amended. See, s 165.031(7)(d), F.S. (1982 Supp.), defining `merger' to include, among other things, `the merging of one or more municipalities or special districts, in any combination thereof, with each other; or the merging of one or more countieswith one or more special districts.' (e.s.) A merger may be accomplished by the adoption of concurrent ordinances of the affected municipalities or counties or, in the case of special districts, by resolution of the governing body of each of the affected districts. Section 165.041(4), F.S. (1982 Supp.). Cf., s165.041(3) setting forth the procedures for a charter for merger of two or more municipalities and associated unincorporated areas. The merger or incorporation procedures may be initiated either by resolution of the governing body of affected units or by petition of 10 percent of the qualified voters in the area to be affected. Section 165.041(5). And see, s 165.071(2), F.S. 1981, which provides that the government formed by the merger of existing special districts shall assume all indebtedness of, and receive title to all property owned by, the preexisting special districts; moreover, the merger agreement shall provide for the determination of the proper allocation of the indebtedness so assumed and the manner in which said debt shall be retired.
Recently, the Fourth District Court of Appeal in Fire Control District, No. 7, Trail Park v. Palm Beach County, 423 So.2d 539 (4 D.C.A. Fla., 1982), concluded that a provision of a special act authorizing the Palm Beach County Commission to create, establish, and abolish fire control districts and to fix the boundaries thereof was invalid as contrary to s 4, Art. VIII, State Const., providing for the transfer of powers or functions between and among governmental entities, and to Ch. 165, F.S. (1974 Supp.), providing for the formation of special districts. (Sections165.022 and 165.031[7][d], F.S. [1974 Supp.], are substantially identical with ss 165.022 and 165.031[7][d], F.S. [1982 Supp.].) Pursuant to the special act, the Palm Beach County Commission had passed a resolution modifying the boundaries of two fire districts, making the boundaries of one of the districts larger while constricting the boundaries of the other. The court held that the boundary change of one district with another constituted a transfer of power within the meaning of s 4, Art. VIII, State Const., and a merger within the meaning of Ch. 165, F.S. (1974 Supp.); therefore, any provision of the special act which was inconsistent with either s 4, Art. VIII, or Ch. 165, F.S. (1974 Supp.), was invalid.
 Specifically the portion of Chapter 63-1747 which allows the Board of County Commissioners of Palm Beach County, Florida to create, establish and abolish Fire Control Tax Districts and fix the boundaries thereof in Palm Beach County without a resolution by the governing body of the areas to be affected or petition of ten percent of the qualified voters in each area is invalid as contrary to Article VIII, Section 4, of the Florida Constitution and Chapter 165 of the Florida Statutes. We find specifically that the statutory definition of `formation' found in Chapter 165 does include a merger such as we have here dictating that Chapter 165 does establish the procedure to be used in these types of situations. 423 So.2d at 541.
Therefore, to the extent that the alteration or modification of the special district's boundaries contemplate a change of the boundaries as considered in the foregoing decision of the Fourth District Court of Appeal, such a modification would appear to be governed by the provisions of Ch. 165 F.S., as amended, relating to the formation of such districts, and by s 4, Art. VIII, State Const.
Chapter 165, F.S., as amended, also prescribes the procedures to be followed when a special district is dissolved. Section165.051(1), F.S. 1981, provides in pertinent part that the charter of any existing special district may be revoked and the special district dissolved either by a special act of the Legislature or an ordinance of the governing body of the special district approved by a vote of the qualified voters. See generally, s165.061(4), F.S. 1981, setting forth certain conditions for the dissolution of a special district; and s 165.071(3), F.S. 1981, regarding the financial allocations to be made upon dissolution of a special district. And see, s 165.051(2), F.S. 1981, which sets forth the procedural aspects regarding voter approval which must be utilized if the special district is to be dissolved byordinance of the governing body of the special district. See also, AGO 75-27; and AGO 82-88 concluding that if a water control district is to be dissolved by ordinance of the governing body of the district, voter approval of such action must not be sought sooner than 30 days after adoption of the ordinance by the governing body; in addition to such time limitation which is applicable to any regularly scheduled or special election held to obtain voter approval, the date for a special election to be held prior to the next regularly scheduled election must be approved by a majority of the members of the governing body of each governmental unit affected, i.e., the governing body of the county or counties in which the special district is located and the governing body of the special district at issue.
Therefore, a special district may be dissolved either by special act of the Legislature or by ordinance of the special district's governing body. Any such ordinance passed by the district's board of commissioners must be approved by vote of the qualified electors as prescribed in Ch. 165, F.S., as amended. A special act of the Legislature abolishing the district would be subject to the terms and conditions of s 10, Art. III, State Const., discussed supra.
Finally, I note that s 6(d) of Art. VIII, State Const., provides that `[l]ocal laws relating only to unincorporated areas of a county on the effective date of this article may be amended or repealed by county ordinance.' See, AGO 81-7 wherein this office stated, among other things, that the provisions of s 6(d), Art. VIII, apply to noncharter as well as to charter counties. A county's authority to amend or repeal such local laws is, however, limited to those laws which relate only to the unincorporated areas of the county. See, e.g., Spaulding v. St. Johns County,384 So.2d 1276 (Fla. 1980) (under s 6[d], Art. VIII, board of county commissioners was without power to amend local law, language of which did not suggest that it was to be limited in its operation to unincorporated areas of the county); AGO's 81-7 and 81-55 (charter county not empowered to enact county ordinance which attemps to amend or repeal any special act creating and establishing an independent special district that is separate from such charter county government with county-wide jurisdiction whose enabling legislation is of county-wide force and effect).
This office has previously stated that the purpose of s 6(d), Art. VIII, supra, was `to assist in the orderly transition of the counties to their new home rule status without having to go to the trouble and expense of special legislative acts to repeal or amend preexisting statutes concerning purely local matters that the counties are now able to handle on their own by county ordinance.' See, AGO 70-55; see also, AGO's 66-99 and 71-146. In considering the effect of s 6(d), Art. VIII, however, this office has stated that such authority does not extend to or include the power to amend or repeal a special act creating a public corporation or a special district. See, AGO 71-102 stating:
 A basic principle of county `home rule' is that it is a redistribution between the state and the counties of the state's sovereign powers; it is not an enlargement of the functions of government. . . . When the legislature has delegated to a public corporation, such as a development authority or a road district or other special district, a governmental or public function that could have been delegated to a county to perform, it has, in effect, reserved to the state the power to control this particular function or service until such time as the legislature itself may decide in its wisdom to relinquish to the county the right to do so. This being so, there is nothing for the county's `home rule' power to operate upon insofar as this particular governmental or public function is concerned.
See also, AGO 71-154.
Accordingly, based upon the foregoing, I am of the opinion that a transfer of any function or power from a special fire control district to the county or another special district must be accomplished as prescribed in s 4, Art. VIII, State Const., i.e., by resolution of the governing bodies of the governmental units affected or by special act of the Legislature specifically addressing the transfer. Such action must be approved by vote of the electors of the transferor and of the transferred unless the Legislature prescribes an alternative method of approval. In addition, s 165.041(4), F.S. (1982 Supp.), prescribes the method for the merger of a county with one or more special districts or of two or more special districts by ordinance or resolution, as the case may be, of the affected county and/or special districts; and s 165.051(1), F.S., provides for the dissolution of a special district to be accomplished either by special act of the Legislature or by ordinance of the governing body of the special district approved by vote of the qualified voters of the district. Any special law seeking to dissolve a special district or to transfer any of the district's functions or powers within the meaning of s 4, *3058 Art. VIII, State Const., must comply with the provisions of s 10, Art. III, State Const., which required that before a special act may be effectively passed either notice of the intention to seek enactment of the special act must be published in the manner prescribed by law or approval by referendum of the special act must be provided for in the act.
Sincerely,
Jim Smith, Attorney General
Prepared by: Joslyn Wilson, Assistant Attorney General