ORFINGER, Judge.
The pivotal issue in this case is the facial constitutionality of an amendment to the Volusia County Charter which establishes a Beach Trust Commission, and which authorizes the County Council, with the advice of the Commission, to adopt a Unified Beach Code “comprehensively regulating public health, safety and welfare on and pertaining to the [Atlantic Ocean] beach” within the county. The trial court implicitly found the charter amendment to be facially constitutional. We affirm.
This action commenced when four municipalities located in Volusia County challenged the proposed Charter Amendment 4, requesting an injunction to prohibit a county-wide election for approval of the amendment, and a declaratory judgment to determine the constitutionality of the amendment. The trial court denied the request for injunctive relief but reserved ruling on the request for declaratory judgment.
Subsequently, the election was held and Amendment 4 was adopted by a majority of those voting in the election. Three of the four cities then entered voluntary dismissals, leaving the City of New Smyrna Beach (City) as the sole plaintiff. The City amended its complaint alleging that the amendment failed to pass by majority vote within the municipal limits of the City. After the County filed its answer, a non-jury trial was held based on stipulated facts and on the testimony of certain witnesses.
The municipal boundaries of the City include all beaches and oceanfront property within the city limits. Since 1943, the City has performed various governmental activities and operations relating to its beaches. The County, by agreement with the City, provides life guard services and has maintained traffic signals on thoroughfares leading to the beach. The County also has partially provided ambulance services exclusively allocated to the beach and provides coordinated civil defense for the City’s beaches.
In the early 1980’s, because of the conflicting policies of the various municipalities within the county with regard to beach access and regulation, a Chamber of Commerce committee recommended that a sin *1381 gle entity be established to regulate and manage the beaches. In 1983 the Volusia Interlocal Beach Commission (VIBC) was created by agreement between the cities of Daytona Beach Shores, Ormond Beach, Ponce Inlet, and Volusia County to study problems relating to beach management.[1] The VIBC issued a final report, recommending a uniform regulatory plan applicable to all Volusia County beaches.
In 1985, a Charter Review Commission was formed to study beach management. In August of 1986, the Commission issued its final report in which it expressed its concern for the political inequities resulting from the control of the beaches by municipalities. The Commission also determined that there “is a definite need to protect the traditional rights of public access and enjoyment of Volusia beaches.” The report further stated that vehicular access to the beach had been dramatically reduced by the policies of beachfront cities. The Commission found that without a county-wide uniform access fee, “public rights of beach access are in great jeopardy,” that off-beach parking was needed to protect public access and that a county-wide beach agency was the most effective method of providing such facilities.
To address the concerns and issues which had been identified during its study, the Commission recommended the adoption of a Charter Amendment[2] to create a Beach *1382 Trust Commission for the purpose of unifying beach regulations. As previously indicated, the proposed charter amendment was submitted to the electorate and was approved by a majority vote. The tabulated results indicated that a majority of those voting within each of the affected cities approved the amendment, except for those precincts within New Smyrna Beach, where the majority disapproved it.
At the heart of this controversy is the tension between two apparently conflicting provisions of the Florida Constitution. The first provision provides for the exercise of powers by a chartered county government:
Counties operating under county charters shall have all powers of local self-government not inconsistent with general law, or with special law approved by vote of the electors. The governing body of a county operating under a charter may enact county ordinances not inconsistent with general law. The charter shall provide which shall prevail in the event of conflict between county and municipal ordinances.
Art. VIII, § 1(g), Fla. Const. The second provision provides for the transfer of powers between county and municipal governments:
By law or by resolution of the governing bodies of each of the governments affected, any function or power of a county, municipality or special district may be transferred to or contracted to be performed by another county, municipality or special district, after approval by vote of the electors of the transferor and approval by vote of the electors of the transferee, or as otherwise provided by law.
Art. VIII, § 4, Fla. Const. The city argues that the provisions of Amendment 4 constitute a transfer of the City’s powers relating to the beaches and beach services, and are thus invalid absent approval by the dual referenda specified in Article VIII, section 4.
The City relies on Sarasota County v. Town of Longboat Key, 355 So.2d 1197 (Fla.1978), where the county commission adopted an ordinance proposing five amendments to the county charter which would transfer the responsibilities for performing five distinct governmental functions from four Sarasota County cities to the county. These functions were: (1) air and water pollution control; (2) parks and recreation; (3) roads and bridges; (4) planning and zoning; and (5) police. The trial court issued an injunction prohibiting the referendum and the county appealed. On appeal, there was no serious dispute that the proposed charter amendment involved a transfer of functions between different units of government. Rather, the county argued that under section 1(g) of Article VIII, charter counties were excluded from the dual referendum requirement. The court rejected this argument and expressed its reluctance to “elevate the general provisions of Article VIII, Section 1(g) to a dominant position over the specific provision of Article VIII, Section 4.” In rejecting this argument, the court held that a transfer of governmental powers requires the distinctive features prescribed in Article VIII, section 4, i.e., a law or resolution of the governing bodies of each of the governments affected. It concluded that the five proposed amendments constituted attempts to transfer powers and functions from the cities to the county which were invalid because the requirements of Article VIII, section 4 had not been complied with.
Subsequent decisions of the supreme court have distinguished, and in fact, have clarified the holding of Sarasota County. In City of Palm Beach Gardens v. Barnes, 390 So.2d 1188 (Fla.1980) the court held that a contract between the city and the county sheriff to perform law enforcement services within the city did not fall within the ambit of Article VIII, section 4. In Miami Dolphins v. Metropolitan Dade County, 394 So.2d 981 (Fla.1981), a group of Dade County citizens, joined by the in-tervenor Miami Dolphins, challenged a plan by the county to use revenues of a tourist room tax to modernize and improve the Orange Bowl Football Stadium. The con- *1383 testante argued that the plan improperly attempted to transfer a function from the city (as owner of the stadium) to the county, thus requiring compliance with the procedure specified in Article VIII, section 4. The court rejected this contention, distinguished Sarasota County, and held that the ordinance in question did not seek to transfer jurisdiction over the Orange Bowl from the city to the county, but simply allocated certain tax revenues for the renovation of the stadium, which the city was asked to accept.
The most recent resolution of this issue by the supreme court, and the one on which the County relies heavily, is Broward County v. City of Fort Lauderdale, 480 So.2d 631 (Fla.1985). There, the city sought to enjoin a county-wide referendum to amend the county charter to provide that county ordinances relating to the regulation of handguns would prevail over conflicting municipal ordinances. The trial court denied the request and the city appealed. The Fourth District read Sarasota County broadly, and when it determined that the purpose of the amendment was to restrict the city’s power over handgun management, concluded that the proposal was for a transfer of power from the city to the county, which could not be accomplished without compliance with Article VIII, section 4. 458 So.2d at 785.
In quashing the decision of the district court of appeal, the supreme court reviewed the respective functions of section 1(g) and section 4 of Article VIII, and distinguished them thusly:
We hold that section 1(g) permits regulatory preemption by counties, while section 4 requires dual referenda to transfer functions or powers relating to services. A charter county may preempt a municipal regulatory power in such areas as handgun sales when county-wide uniformity will best further the ends of government. § 125.86(7), Fla.Stat. (1983). Dual referenda are necessary when the preemption goes beyond regulation and intrudes upon a municipality’s provision of services.
[[Image here]]
We believe the distinction between regulatory preemption, and transfer of functions and powers relating to services, achieves the balance between sections 1(g) and 4 intended by the framers of the 1968 constitution. [Emphasis in original].
480 So.2d at 635. The court again revisited Sarasota County, and observed that in that case, the “wholesale assumption of the burden of providing what had been municipal services [went] far beyond regulatory preemption....” Id.
The City argues that the operative provisions of Amendment 4 impermissibly shift the responsibility of control of beach services from the City to the County. However, the amendment reveals that it is carefully drafted to pertain only to regulatory matters. The expressed intent of the amendment is to guarantee beach access to the public. To effectuate this purpose, section 205.1 mandates the County Council to authorize “as permitted by law”[3] vehicular access in areas of the beach not reasonably accessible from public parking facilities.
(2) Vehicular traffic, except that which is necessary for cleanup, repair, or public safety, or for the purpose of maintaining existing authorized public accessways, is prohibited on coastal beaches. Notwithstanding the provisions of this subsection, the local government with jurisdiction over a coastal beach or part of a coastal beach, by a three-fifths vote of its governing body, may authorize vehicular traffic on all or portions of the beaches under its jurisdiction. Any such local government shall be authorized by a three-fifths vote of its governing body to charge a reasonable fee for vehicular traffic access. The revenues from any such fees shall be used only for beach maintenance purposes. Except where authorized by the local government, any person driving any vehicle on, over, or across the beach shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. [Footnote omitted],
§ 161.58(2), Fla.Stat. (1985). See also City of Daytona Beach Shores v. State, 483 So.2d 405 (Fla.1985). *1384 Section 205.4 gives to the Council exclusive power to impose reasonable vehicular beach access fee and prohibits municipalities from charging any additional fees. Section 205.3 authorizes a comprehensive unified beach code regulating all aspects of the public health, safety, and welfare on and pertaining to the beach. Finally, section 205.6 grants to the County exclusive regulatory jurisdiction over the beaches and approaches. On their face, none of these provisions relate to the provision of services. Rather, they pertain exclusively to the County’s regulatory powers over the beaches, an area which the Beach Trust Commission found to be “conducive to uniform countywide enforcement.” § 125.86(7), Fla.Stat. (1985). Moreover, section 205.5 expressly disclaims any intent to assume control over services provided by municipalities and prohibits the County from duplicating any services already provided by the City. The City argues that Amendment 4 divests it of functions and powers relating to the beach that it has previously exercised. However, the control to be exercised by the county, i.e., access fees, regulation of traffic, rules pertaining to individual conduct, operation and parking of vehicles on the beach, etc., clearly relates to regulation of those members of the public making use of the beach. These matters, like regulation of firearms, are areas which section 1(g) authorizes the county to regulate on a county-wide basis, preempting local governments. Broward County; § 125.86(7), Fla.Stat. (1985).
We reject the City’s contention that the amendment does not address a county-wide concern. The Charter Review Commission determined from its study that the regulation of the beach has county-wide economic, political and recreational implications. Certainly use of the beaches is not confined to only those residents of the municipalities which directly abut the beach. We conclude that there is a logical basis shown by this record for the finding that uniform regulation of the beach is required in the public interest. We find nothing in the amendment which attempts to usurp the powers of the municipalities to provide services to the beaches as they do to other areas within their respective limits. By its express language, “[n]o function or power relating to services is transferred from any municipality to the County.” § 205.5. The amendment contemplates distribution of beach access revenues to the cities for the continued provision of services. We therefore conclude that the amendment does not facially conflict with Article VIII, section 4.
We also affirm the trial court’s conclusion that it is premature to determine the constitutionality of the amendment as it applies to the City. The amendment is not self-executing, but requires the adoption of a Unified Beach Code. The effect of any such code was not before the trial court and is not before us here. We have carefully considered the remaining arguments raised by the City but find them to be without merit.
AFFIRMED.
DAUKSCH and COWART, JJ„ concur.

. The City of New Smyrna Beach declined to participate in the VIBC. It was the City’s position that it did not share the same problems faced by those beach communities north of Ponce Inlet.

. The pertinent portions of the Charter Amendment provide:
Section 205 — Unified Countywide Beach Regulations
Section 205.1. THE BEACH: PUBLIC RIGHT OF ACCESS AND USE.
The public has a right of access to the beaches and a right to use the beaches for recreation and other customary purposes. This right of access and use is a public trust, which the Council shall by ordinance define, protect, and enforce. Because prohibiting motor vehicle access to the beaches would deny beach use to many, the Council shall authorize, as permitted by law, vehicular access to any part of the beach not reasonably accessible from public parking facilities on or adjacent to the beach.
Section 205.2. BEACH TRUST COMMISSION
The BEACH TRUST COMMISSION is created to consist of residents of municipalities and unincorporated areas in the coastal area appointed by their governing bodies with representation apportioned on the basis of population, as provided by ordinance. The Council shall assign administrative duties under this article to the Commission and a County department.
Section 205.3. UNIFIED BEACH CODE With the advice of the Commission, the Council shall have the power and it shall be its duty, on or before January 1, 1988, to enact an ordinance, to be known as the Unified Beach Code ("Code"), comprehensively regulating public health, safety, and welfare on and pertaining to the beach, including, but not limited to, regulation of: individual conduct; pedestrian safety; vehicular access and fees; operation and parking of vehicles on beaches and approaches; and vendors, concessionaires, and special events.
Section 205.4. VEHICULAR ACCESS FEES The Council shall have the exclusive power to impose a uniform, reasonable vehicular beach access fee, but no other fee shall be charged for individual beach access or use. Revenues derived from vehicular access fees and all other revenues derived from the beach shall be expended solely for direct beach purposes permitted by law. Directly and by grants to municipalities, the Council shall expend such revenues to maintain a uniform level of services responsive to use and demand.
Section 205.5. DELIVERY OF SERVICES ON THE BEACH
No function or power relating to services is transferred from any municipality to the County. The municipalities may continue to deliver any services on their beaches, which shall not be duplicated by the County. However, if authorized by a municipality, the County shall assume, at the County’s expense, any municipal beach service.
Section 205.6. EFFECT OF UNIFIED BEACH CODE
The County shall have jurisdiction over the coastal beaches and approaches as well as exclusive authority to regulate the beaches and public beach access and use. To the extent sovereign immunity has been waived, the County shall assume any governmental liability arising after the Code takes effect for claims in areas controlled by the County under this article, including claims alleging failure to warn of dangers, but unless otherwise agreed, the County will not be liable for any act of a municipality. Any ordinance enacted pursuant to this article shall prevail in the event of conflict with a municipal ordinance.

. Section 161.58(2), Florida Statutes provides the procedure whereby local governments may authorize vehicular traffic on beaches: