995 So.2d 1017 (2008)
PALM BEACH COUNTY, Appellant,
v.
CITY OF BOCA RATON and City of Delray Beach, et al., Appellees.
No. 4D07-3287.
District Court of Appeal of Florida, Fourth District.
October 29, 2008.
Rehearing Denied December 30, 2008.
*1018 Denise M. Nieman, County Attorney, Leonard Berger, Assistant County Attorney; and Susan F. Delegal, Clark J. Cochran and Donna M. Krusbe of Billing, Cochran, Heath, Lyles, Mauro, Anderson & Ramsey, P.A., West Palm Beach, for appellant.
Diana Grub Frieser, City Attorney, Boca Raton; Susan Ruby, City Attorney, Delray Beach; and Jamie Alan Cole and Matthew H. Mandel of Weiss Serota Helfman Pastoriza Cole & Boniske, P.L., Fort Lauderdale, for appellees.
James A. Cherof and Jamila V. Alexander of Goren, Cherof, Doody & Ezrol, P.A., Fort Lauderdale, for Intervenor-City of Boynton Beach.
Virginia Saunders Delegal, Tallahassee, for Amicus Curiae-Florida Association of Counties, Inc.
Andrew S. Maurodis, Deerfield Beach, for Amicus Curiae-EMS Coalition.
STONE, J.
Palm Beach County (County) appeals a declaratory judgment and injunction precluding County's use of county ad valorem tax funds to operate its fire/rescue dispatch system.
*1019 Historically, the cities of Boca Raton and Delray Beach (Cities) operated their own dispatch system for fire and police rescue, taxing their residents for the service. In 2005, County began using county funds to finance the County Dispatch System (CDS) to dispatch fire rescue and other services to unincorporated areas and participating cities. To encourage municipal participation, County initiated an incentive program, furnishing dispatch equipment to participating cities.
Cities[1] contend that County's funding of CDS with countywide revenues amounted to a double taxation, in violation of Section 1(h) of Article VIII of the Florida Constitution.
The two issues on appeal are whether Cities met their burden of showing that CDS provides no real and substantial benefit to them, and whether County's acts constitute an indirect transfer of power from Cities to County, and whether such acts are unconstitutional.
Article VIII, Section 1(h) of the Florida Constitution provides: "Taxes; limitation. Property situate within municipalities shall not be subject to taxation for services rendered by the County exclusively for the benefit of the property or residents in unincorporated areas." In the seminal case of City of St. Petersburg v. Briley, Wild, & Associates, 239 So.2d 817, 822-23 (Fla.1970), the supreme court interpreted the section as "prohibit[ing] the taxation of municipally-situate property by the County for any services rendered by the County where no real or substantial benefit accrues to city property from such services." The court clarified, however, that Section 1(h) "does not require a direct and primary use benefit from a particular service to city-located property." Id. at 823. "All that is required is a minimum level of benefit which is not illusory, ephemeral or inconsequential." Town of Palm Beach v. Palm Beach County, 460 So.2d 879, 881 (Fla.1984) (citing Briley, Wild, 239 So.2d at 823) (emphasis added).
Indeed, "[p]otential as well as actual (present) benefits may be considered." Palm Beach County v. Town of Palm Beach, 426 So.2d 1063, 1066 (Fla. 4th DCA 1983), remanded on other grounds, 460 So.2d 879 (1984). Direct and indirect benefits must be considered as a composite. See Town of Palm Beach, 460 So.2d at 883. As this court clarified, Section 1(h) "does not prohibit `dual taxation'; or `double taxation' as those terms are ordinarily understood. What is prohibited is `taxation without benefit.'" Town of Palm Beach, 426 So.2d at 1066. A petitioner bears the burden of proving the "negative  that a service provided by the county and funded by county-wide revenues does not provide a real and substantial benefit to the particular municipality." Town of Palm Beach, 460 So.2d at 881. The supreme court further noted that "this will be heavy burden, but it is by no means impossible to prove." Id.
In Town of Palm Beach, 460 So.2d at 881, four cities, including Boca Raton, claimed that the use of county-wide taxes to fund the county sheriff's road patrol and detective divisions violated Section 1(h). There, the cities claimed they obtained no real or substantial benefit "from the sheriff's backup or standby capacity," which was not "widely used in the past." Id. at 881-82 (explaining that the issue was one of law and analyzing the proper "legal conclusion to be drawn from this fact").
*1020 The record showed that the sheriff's department was "available to assist any municipality in times of emergency or when requested." Id. at 883. The cities emphasized the minimal number of assists from the county when compared "as a percentage of police activity." Id. The court, however, noted that "[m]unicipal residents often travel in the unincorporated areas and thereby temporarily fall within the protective jurisdiction of the sheriff. Whenever called upon by a municipality, though historically infrequently, the sheriff's patrol and detective divisions have responded." Id.
The supreme court stressed that "the relative number of assists is not the sole issue. The constitutional question is whether the municipal residents substantially benefit from the challenged programs, and not whether the county provides proportionally significant services." Id. The supreme court elaborated that the pertinent issue "is not one of equity and fairness" and that the prohibition "against `double taxation' ... [is] not framed in terms of proportionality." Id. at 881. Explaining that the court must "review the benefits delivered by the challenged service as a composite," not independently, the Town of Palm Beach court found "that the sheriff's road patrol and detective divisions provide not only a minimal level of direct benefit, but also a substantial degree of indirect benefit." Id. (admonishing the trial judge for failing to consider "evidence of unquantifiable indirect and potential benefits").
The supreme court later reached the same conclusion in Escambia County v. City of Pensacola, 469 So.2d 1378, 1379 (Fla.1985), where the city argued absence of any benefit from county sheriff's road patrol in unincorporated areas. See also City of Ormond Beach v. County of Volusia, 383 So.2d 671, 672 (Fla. 5th DCA 1980) (discussing challenge to taxation for county library within city); Alsdorf v. Broward County, 373 So.2d 695 (Fla. 4th DCA 1979) (analyzing challenge to county funded library within municipality having its own library system).
Here, Cities had the burden to prove that the services dispatched by CDS, as a composite, do not provide a real and substantial benefit to their residents or property. The instant facts are generally undisputed, the issue remaining on the legal conclusion to be drawn from the fact that Cities do not widely use some services provided by CDS, do not want to use others, are dissatisfied with another, and the fact that some benefits are potential and not present. This court must "determine whether the appropriate rule of law has been applied to the factual findings." Town of Palm Beach, 426 So.2d at 1068.
County has identified twelve benefits, which we summarize below, that Cities' residents obtain from CDS.
(1) CDS is the exclusive means to dispatch and track the Trauma Hawk helicopter, which airlifts patients to a hospital. In the past five years, CDS has dispatched Trauma Hawk to twenty six people in Boca Raton and one person in Delray Beach.[2] The trial court concluded that "there is an alternative source for this funding, and Trauma Hawk, therefore, should not be included in the services which the County represents must be funded through general County funds." Although Cities do not dispute that their residents benefit from having Trauma Hawk available, the trial court concluded that "the limited extent that residents of the Cities arguably benefit from the availability *1021 of Trauma Hawk, the infrequency of its use by residents could not justify its being financed from substantial ad valorem taxes, where billing for individual uses could be."
(2) CDS supports the Radio Talk Group Hospital Notification System (radio system), which is a state-mandated program of coordinating medical personnel at the scene of a mass casualty with a hospital anywhere in the county. Although Cities concede that the radio system benefits their residents, the trial court concluded that Cities never used, nor plan to use, this service and that it should be financed out of a separate taxing authority, as the residents of Cities do not derive a real and substantial benefit from that service.
(3) The bomb squad is a service dispatched by CDS. Delray Beach does not have its own. The existing procedure is for County fire rescue and the bomb squad to respond to suspicious package calls. Delray Beach city manager attempted to dismiss any benefit his city obtains from having this available to it. The trial court concluded that "this service is infrequent and readily fundable through discrete funding mechanisms, such as a per-use fee."
(4) County uses CDS to coordinate emergency aid to Cities, pursuant to mutual assistance agreements between County and municipalities. The trial court compared the nine times that County provided aid to Boca Raton, with forty times that Boca Raton provided aid to County, and no aid was provided to Delray Beach. The trial court concluded that "any small benefit received by [Cities] from the mutual aid agreement is more than offset by the reciprocal mutual aid which they provide to the unincorporated areas."
In addition, CDS is used to dispatch and monitor the four Hazardous Materials Response Teams (HazMat) throughout the county. The Delray Beach fire chief agreed that his city benefits from having backup of County's HazMat available in case his own HazMat team needs assistance. The Boca Raton fire chief similarly agreed that this service benefits Boca Raton residents. The trial court concluded that "any benefit received is inconsequential compared to the approximate 450,000 emergency calls handled by [CDS] and is more than offset by the Cities' reciprocal HazMat . . . response."
(6) CDS dispatches emergency aid to City residents traveling outside the city boundaries. The Boca Raton fire chief testified that such emergency aid is a mutual benefit to Cities' and County's residents. Delray Beach's fire chief also reluctantly conceded that availability of this county service is a benefit to his residents. The trial court found that over two years, County used CDS to dispatch emergency aid to 759 city residents. Then, the court concluded: "However, these calls principally relate to accidents on section of Interstate 95 and Florida's Turnpike, which happen to run through the [Cities'] areas. Accordingly, neither the Cities nor the Intervenors derive a real and substantial benefit from this service."
(7) CDS provides response in the event of a large scale disaster. Stating that because this service has not been used during the past hurricanes and tornadoes, the trial court found that "the potential assistance of this benefit is wholly speculative."
(8) CDS is used for closest unit response, which is where "the closest unit, regardless of where the call is and where the patient or the person in need of emergency is, that we [County] get the closest unit." Cities benefit from this service whenever their resident travels through a participating area. The trial court stated *1022 that "cities do not use this system and do not want to use it, as they feel their existing systems perform this function better than the County could."
(9) A benefit that is yet potential due to Cities' non-participation is CDS' function in avoiding confusion in mixed service areas. Due to thirty-eight municipalities that make up the county, numerous calls from different jurisdictions may be placed to report the same emergency. CDS would avoid duplicative responses. The trial court found no real and substantial benefit, explaining "local dispatchers are more familiar with local landmarks and are better able to ascertain the location of an incident when taking an emergency call," and "Cities have shown that use of countywide dispatch would not appreciably improve services."
(10) CDS is used to transfer to Cities the cell phone calls erroneously sent to an incorrect dispatch. The trial court found this service did not rise to the level of real and substantial benefit because in the past five years, the sheriff's office erroneously transferred thirty calls, and because "it is reciprocated by the Petitioners, whose residents should not be made to pay for it."
(11) & (12) Finally, County identified two benefits that are potential and not yet in existence. Traffic light preemption is currently in the development stage and is a system that "coordinate[s] the cycling of the traffic lights in order to allow emergency vehicles to proceed through intersections not on a red light." The trial court did not find this potential service to amount to real and substantial benefit because "there has been no showing that any municipality has requested this service, or that it could not itself install the service within its own area." The last potential benefit is that CDS would allow County to track and report response data on the calls it handles. The trial court failed to find the requisite benefit level because this service was only potential and "can be accomplished by each . . . municipality for itself without the [CDS]."
In dismissing most of the services, the trial court found that Cities rarely used the county-provided CDS service. For example, the trial court found that the nine times that County provided mutual aid to Boca Raton, in the past five years, was a "small benefit" that was not real and substantial, and two HazMat responses to Boca Raton and two to Delray were inconsequential when compared to Cities' responses in the unincorporated area. The trial court dismissed other services, reasoning that they could be provided by means other than CDS, or funded by means other than county taxes. Considering the composite, the trial court found that CDS services did not provide real and substantial benefit to Cities, explaining that "[m]ost of the [County] services are not needed, some would be inferior to what the [Cities] presently have, and some might never be provided."
It is well established that the relative number of assists is not the sole issue, and Cities' preference for their own, different systems does not warrant a finding that Cities do not receive real and substantial benefit from county funded service. See Alsdorf, 373 So.2d at 699; Town of Palm Beach, 460 So.2d at 883. The fact that Cities assert that they do not want or need CDS-derived benefits is not support for a finding of no real and substantial benefit where the services are nonetheless available to city residents. See City of Ormond Beach, 383 So.2d at 674. Here, Cities failed to meet their heavy burden of proving that services dispatched by CDS do not provide a minimal level of benefit and are, instead, merely illusory and inconsequential. Further, the trial court erred when it applied proportionality *1023 and fairness tests in resolving whether CDS provides real and substantial benefit to Cities. We understand the trial court's concerns, given the costs to Cities' taxpayers that in many of the above instances appear disproportionately heavy, where Cities elect to maintain their existing, apparently effective, services. However, the bar is set very high, as reflected in the cases set out above. We conclude, as a matter of law, that Cities have failed to meet their heavy burden.
The second issue is whether the trial court erred in finding that "county seeks to effect a transfer of powers from the . . . municipalities to the County, by imposing double taxation through ad valorem taxes without approval of the voters." As a result, the trial court declared that County's voluntary incentive program violated Article VIII, Section 4 of the Florida Constitution.
Article VIII, Section 4 provides:
Transfer of powersBy law or by resolution of the governing bodies of each of the government affected, any function or power of a county, municipality or special district may be transferred to or contracted to be performed by another county, municipality or special district, after approval by vote of the electors of the transferor and approval by vote of the electors of the transferee, or as otherwise provided by law.

Art. VIII, § 4, Fla. Const. (emphasis added).
We conclude that the trial court erred in declaring that County's incentive program, providing dispatch equipment to cities participating in CDS, violated Section 4 "because it is an indirect method of accomplishing that which the County could not directly requireforcing the transfer of municipal fire rescue dispatch to the County Dispatch System without dual referenda."
In Sarasota County v. Town of Longboat Key, 355 So.2d 1197, 1198 (Fla.1978), the cities challenged a proposed county referendum to amend the county charter and, thus, transfer responsibility for five city functions to the county. The supreme court held that the county's "five proposed amendments constitute[d] attempts to transfer powers and functions from the cities to the county within Article VIII, Section 4," but were invalid for failure to comply with a different part of that Section. Id. at 1201.
According to Sarasota County, Section 4 prohibition against transfer of powers without a dual referenda applies where a county (as relevant here) would assume complete responsibility for "functions previously exercised by the city." Miami Dolphins, Ltd. v. Metro. Dade County, 394 So.2d 981, 984 (Fla.1981). In other words, "[n]o longer would the cities involved have had any control over those functions, which would have become the responsibility of the county alone." Id. at 984-85; see also City of Palm Beach Gardens v. Barnes, 390 So.2d 1188, 1189 (Fla.1980).
In City of Ormond Beach, 383 So.2d at 672, the court recognized that a transfer of powers did not occur where both entities operated separate library systems, "the County established a county-wide unified library system in which all cities then operating libraries joined, except Ormond Beach. The cities which joined lost their authority to manage the library function and to make financial decisions regarding library affairs." Ormond Beach claimed that allowing the county to assume library function in its city, where the city "has not requested the County to assume it and therefore a county tax on city property is improper." Id. The Fifth District recognized that the trial court, in that case, correctly held that no transfer of powers *1024 occurred. Id.; see also Barnes, 390 So.2d at 1189 (Fla.1980) (recognizing that a sheriff "contracting for services with a municipality is clearly different from a municipality transferring or contracting away the authority to supervise and control its police powers to the county government").
Here, although County's goal may well be to ultimately have one central dispatch, CDS, the incentive program that encourages municipalities to participate in CDS and obtain county dispatch equipment, does not amount to a transfer of powers from Cities to County because the entire dispatch function of Cities is not being absorbed by County, and Cities may continue to retain their dispatch systems. Although it is possible that County's goal is a transfer of power, that result may not occur.[3] Thus, Cities have not established that County's incentive program would coerce Cities to divest themselves of any power over their dispatch functions and give County absolute and exclusive power to exercise such function. See City of Ormond Beach, 383 So.2d at 672; Barnes, 390 So.2d at 1189.
Therefore, the final judgment is reversed, and we remand for entry of judgment in favor of County.
WARNER and DAMOORGIAN, JJ., concur.
NOTES
[1] Eleven other cities have intervened in the suit, adopting Cities' position, without presenting their own evidence. (R 612)
[2] In Delray Beach, "ground transportation is faster given that Delray Medical Center, one of two trauma centers in the county, is located within its city limits."
[3] For example, counsel for County emphasized and Boca Raton city manager agreed, in Town of Palm Beach, after Boca Raton challenged the county sheriff's road patrols and detective division, Boca Raton still continues to operate its own police and detective divisions.